## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| James Sampson ) | |
| 2737C Back Road ) | |
| Franklin Furnace, Ohio 45629 ) | |
| ) | |
| Roberta Sampson ) | |
| 2737C Back Road ) | |
| Franklin Furnace, Ohio 45629 ) | |
| ) | |
| Brian Gannon ) | |
| 2737A Back Road ) | |
| Franklin Furnace, Ohio 45629 ) | **CASE NO. 1:17-cv-658** |
| ) | |
| Mary Gannon ) | **Judge _____** |
| 2737A Back Road ) | |
| Franklin Furnace, Ohio 45629 ) | |
| ) | |
| **PLAINTIFFS** ) | **COMPLAINT AND DEMAND FOR A** |
| ) | **JURY TRIAL** |
| **v.** ) | |
| ) | |
| Haverhill Coke Company, LLC ) | |
| 2446 Gallia Pike ) | |
| Franklin Furnace, OH 45629 ) | |
| ) | |
| SunCoke Energy, Inc. ) | |
| 1011 Warrenville Road, Suite 600 ) | |
| Lisle, IL 60532 ) | |
| ) | |
| **DEFENDANTS** ) | |

## INTRODUCTION

1.      James Sampson, Roberta Sampson, Brian Gannon, and Mary Gannon

(collectively "Plaintiffs") bring this civil action because sludge-like deposits, strong

1

odors, particulates (including $PM_{10}$ and, acutely hazardous, $PM_{2.5}$), lead, mercury, arsenic, cadmium, beryllium, chromium, creosote, coke oven emissions, coal tar pitch, coal tar pitch volatiles, coke wastes, coal wastes, dust, polycyclic aromatic hydrocarbons (e.g., benzo(a) pyrene and chrysene) ("PAHs"), sulfur dioxide, oxides of nitrogen, dioxins, volatile organic compounds ("VOCs"), acid gases (such as sulfuric acid, hydrochloric acid, and oxides of sulfur), volatiles, carbon monoxide, benzene, flue gas, chemical clouds and haze, other solid and hazardous wastes, other hazardous substances and pollutants, and mixtures containing such substances (hereinafter collectively referred to as "Noxious and Hazardous Substances") have been and continue to be released from the Haverhill Coke Company plant into the environment at and about the plant.

2.     The Haverhill Coke Company plant is located in Scioto County at 2446 Gallia Pike in Franklin Furnace, Ohio 45629 ("Facility"). The Noxious and Hazardous Substances, including visible deposits ("Visible Deposits"), have migrated and continue to migrate onto the property and into the homes of the Plaintiffs and other area residents, all in violation of the Federal Clean Air Act, 42 U.S.C. § 7401 *et seq*. ("CAA"), the Ohio State Implementation Plan ("Ohio SIP"), and/or the Ohio Revised Code, the Ohio Administrative Code, and the Facility's existing permits.

3.     Said releases have endangered and continue to endanger the health, comfort, safety, and welfare of the public, including the Plaintiffs, and have caused and

2

continue to cause unreasonable injury and damage to property and the environment and constitute a continuing nuisance and trespass. The Facility's unauthorized releases, violations of law and regulation, and unauthorized invasion of the Plaintiffs' property will continue unless abated and restrained.

4.     Plaintiffs seek injunctive relief to compel Defendants to, inter alia: fund and/or undertake the comprehensive investigation and remediation of the contamination that has resulted and will continue to result from the releases of Noxious and Hazardous Substances. Plaintiffs also seek restitution of all costs expended; a comprehensive medical monitoring program; civil penalties; damages, including punitive damages; and injunctive relief for nuisance, trespass, negligence, ultra-hazardous activities, negligent infliction of emotional distress, and intentional infliction of emotional distress.

5.     Defendants Haverhill Coke Company, LLC ("Haverhill") and SunCoke Energy, Inc. ("SunCoke") own and operate the Facility. The Facility is a plant that operates 200 non-recovery coke ovens, which are used to produce nearly 1 million tons of coke annually. As part of its operations, the Facility has coal and coke storage piles; coal handling, processing, and transfer operations; coke and breeze handling and processing operations; two quench towers; 200 coke ovens with heat recovery steam generators; and a cogeneration plant that release Noxious and Hazardous Substances into the environment.

6.     Defendants' repeated and multiple violations of a wide spectrum of permit requirements demonstrate Defendants' past and continuing disregard for the law, including the CAA, and conscious disregard for the impacts of the Facility's operations on the community, and disregard for the Facility's impacts on the quality of the environment in the region. In fact, releases of Noxious and Hazardous Substances, including Visible Deposits, continue, and the effects of said releases have not been remediated despite Defendants' knowledge of said releases and knowledge of the adverse impacts and threats of adverse impacts on health and the environment that are caused by those releases.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and 42 U.S.C. § 7604(a) as a result of the claims made under the CAA, 42 U.S.C. § 7401, *et seq.*, and the federally-approved Ohio SIP. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1355 (action for penalty) and 28 U.S.C. § 2201 (declaratory judgment).

8.     This Court has supplemental jurisdiction, under 28 U.S.C. § 1367, over the claims that arise under the laws of the State of Ohio.

9.     This Court has personal jurisdiction over all the Defendants because each transacts business in Ohio, have contracted to supply services or goods in Ohio, have caused tortious injury in Ohio to Plaintiffs by acts and omissions that occurred within

4

and outside Ohio, and have an interest in, are using, or are in possession of real property, including the Facility, located in Ohio. Further, Defendant Haverhill is registered in Ohio.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 7604(c) in that the violations alleged herein have occurred in this District and the Facility that is the subject of this Complaint is located in this District.

**NOTICE AND NO DILIGENT PROSECUTION**

11.    More than sixty days before the filing of this action under 42 U.S.C. § 7604, the Plaintiffs gave written notice of the violations and their intent to sue by letter of July 19, 2017 to the Defendants and all other persons required to be notified. Each Defendant, Defendants' statutory agents, and governmental officials received that citizen suit notice letter. Defendants' counsel has stated that Defendants will accept service of the Complaint via email on Defendants' counsel.

12.    Neither the United States Environmental Protection Agency ("US EPA") nor a State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the emission standards or limitations described herein.

13.    Certain of the Facility's prior air violations, none of which are alleged herein, were the subject of a federal complaint filed by the United States and Ohio simultaneously with a proposed consent decree in 2013, later resulting in a November

5

2014 consent decree (CD). That CD does not enforce, resolve, or otherwise remedy the violations discussed in this Complaint. For example, the CD does not enforce, resolve, or remedy the Defendants' violations of Ohio's air nuisance provision, Ohio Adm. Code § 3745-15-07, or the corresponding permit term prohibiting such air nuisances.

## THE PARTIES

14.    Plaintiff James Sampson and Plaintiff Roberta Sampson are residents of Scioto County, Ohio, who own property and reside at 2737C Back Road, Franklin Furnace, Ohio 45629. A grandson lives with the Sampsons. The Sampsons' property also contains a rental home that is leased to the Sampsons' son and his family, including five other grandchildren. The Sampsons live and own property within the zone of influence of the Facility's releases and threatened releases of the Noxious and Hazardous Substances into the environment. The Sampsons have farm animals and a small garden, tended to by their grandson, within the zone of influence of the Facility. The Sampsons have been and will continue to be exposed to injury and threatened further injury due to the continuing emissions and releases of Noxious and Hazardous Substances from the Facility in violation of federal and Ohio law.

15.    Plaintiff Brian Gannon and Plaintiff Mary Gannon are residents of Scioto County, Ohio, who own property and reside at 2737A Back Road, Franklin Furnace, Ohio 45629. The Gannons also own the adjoining parcels at 2737E Back Road and 0 Richard Road. The Gannons live and own property within the zone of influence of the

Facility's releases and threatened releases of Noxious and Hazardous Substances into the environment. The Gannons also have goats on their property and are concerned that the water and hay that their goats consume is directly impacted by Noxious and Hazardous Substances. The Gannons have been and will continue to be exposed to injury and threatened further injury due to the continuing emissions and releases of Noxious and Hazardous Substances from the Facility in violation of federal and Ohio law.

16. Plaintiffs have protectable environmental, aesthetic, and conservation interests in their surrounding environment. This includes an interest in protecting their health and welfare, as well as their property.

17. Similarly, Plaintiffs have an interest in the quality of the air they breathe and are continually threatened by the release of Noxious and Hazardous Substances from the Facility.

18. Further, Plaintiffs have an economic interest in protecting their real and personal property and animals and have suffered and will continue to suffer damage to their real and personal property due to the continuing emissions from the Facility in violation of federal and Ohio law.

19. Because Defendants have caused and continue to cause frequent emissions and releases of Noxious and Hazardous Substances from the Facility,

including Visible Deposits, Plaintiffs have a recognizable interest in enforcing federal and state law, including inter alia the CAA and Ohio SIP.

20.    Defendant Haverhill is a Delaware limited liability corporation that has an Ohio address of 2446 Gallia Pike, Franklin Furnace, Ohio 45629. It identifies its principal business address as 1011 Warrenville Road, Suite 600, Lisle, IL 60532. Haverhill is an owner and operator of the Facility and has caused, participated in, controlled, and/or directed the violations of law described in this Complaint. Haverhill knew or should have known about these violations and had the authority to prevent or stop these violations, but failed to do so. Haverhill is a subsidiary of Defendant SunCoke.

21.    Defendant SunCoke is a Delaware corporation. It identifies its principal business address as 1011 Warrenville Road, Suite 600, Lisle, IL 60532. SunCoke is an owner and operator of the Facility and the parent company of Defendant Haverhill.

22.    Defendant SunCoke exercises pervasive control over the Facility and its subsidiaries, including Haverhill. SunCoke has caused, participated in, controlled, and/or directed the violations of law described in this Complaint. SunCoke knew or should have known about these violations and had the authority to prevent or stop these violations, but failed to do so. For example, during relevant times, SunCoke oversaw environmental issues (including noncompliance with air laws) and reporting at the Facility and communicated with regulators about environmental violations at the

8

Facility. It is therefore directly liable for the environmental violations occurring at the Facility.

23.     Further, Defendant SunCoke has disregarded the corporate form of its subsidiaries, including Haverhill, so that those companies have no mind or will of their own. SunCoke has used its control over the Facility and the subsidiaries to perpetrate and otherwise not prevent or abate the environmental violations and torts described in this Complaint. Therefore, the corporate form should be disregarded and liability also assessed against SunCoke for the environmental violations and torts and injuries and damages described herein.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Air Act (CAA)

24.     The CAA is designed to protect and enhance the quality of the nation's air resources so as to protect and promote the public health and welfare and the productive capacity of the nation's population. 42 U.S.C. § 7401(b)(1).

25.     Pursuant to the CAA, the US EPA promulgated national ambient air quality standards ("NAAQS") necessary to protect the public health and welfare. 42 U.S.C. § 7409. The pollutants for which NAAQS have been set include ozone, particulate matter, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead.

26.     The CAA's regulation of NAAQS pollution demonstrates Congressional recognition of the importance of regulating such pollutants.  Such regulation is needed

to protect public health, including the health of sensitive populations, such as asthmatics, children and the elderly, as well as to protect the public welfare.

27.     The CAA requires each state to adopt and submit to US EPA for approval a state implementation plan ("SIP") that provides for the implementation, maintenance, and enforcement of the NAAQS.  42 U.S.C § 7410(a)(1). The State of Ohio submitted to the Ohio SIP for achieving and maintaining said air quality standards. The Ohio SIP was first approved by the US EPA on May 31, 1972 and was incorporated by reference into the Code of Federal Regulations at 40 C.F.R. § 52.1870, thereby becoming enforceable as a matter of federal law.

28.     All of the provisions of the Ohio Administrative Code the Plaintiffs are enforcing in this action are in the Ohio SIP.

29.     The Ohio SIP is required (under 42 U.S.C. § 7471 of the CAA) to contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

30.     In order to prevent the significant deterioration of air quality as required under Section 7471 of the CAA, federal regulations, including inter alia, 40 C.F.R. § 52.21 ("PSD regulations") preclude the construction of new major sources or major modifications without a "prevention of significant deterioration" permit ("PSD permit").

31.     The Facility is such a major source and/or has constructed such major modifications.

32.     PSD regulations for Ohio are set forth in Ohio Administrative Code ("O.A.C.") §§ 3745-31-01 through 3745-31-20. Any Ohio regulations approved as part of the Ohio SIP constitute federal law enforceable under the CAA. Pursuant to 40 C.F.R. § 52.1884, the federal PSD regulations set forth in 40 C.F.R. § 52.21 are also incorporated and made a part of the Ohio SIP. Thus, the Facility is subject to the applicable provisions of the PSD regulations as promulgated by the US EPA.

33.     The Facility is required—and has failed—to comply with the terms of its PSD permits, including its PSD permit effective November 10, 2008, and subsequent modifications that include, inter alia, the December 26, 2008; February 19, 2015; December 8, 2015; and November 21, 2016 modifications (collectively, the "PSD Permit").

34.     The Facility operates 200 non-recovery coke ovens designated as Batteries A, B, C, and D. Batteries A and B began operation in 2005 and are identified by the Facility's PSD Permit as part of emission unit P901. Batteries C and D began operation in 2008 and are identified by the Facility's PSD Permit as part of emissions unit P902.

35.     P901 has five bypass vent stacks (VS1–VS5) and P902 has five bypass vent stacks (VS6–VS10) that are subject to emission limits as set forth in the Facility's PSD

Permit. When these vent stacks are open, Noxious and Hazardous Substances are emitted.

36. In addition to the 200 coke ovens, and as part of its coke making operations, the Facility has coal and coke storage piles (F002); coal handling, processing, and transfer operations (F003); coke and breeze handling and processing operations (F004); and two quench towers (P001 and P002).

37. The Facility's PSD Permit contains emissions limits and operational standards for emission units, including, inter alia, P901, P902, F002, F003, F004, P001, and P002.

38. The citizen suit provision of the CAA authorizes "any person" to commence a civil action against "any person" who is alleged to have violated or to be in violation of any "emission standard or limitation under [the CAA]," including any requirement in any approved SIP, any permit term or condition in effect under the CAA or an approved SIP, or a condition or requirement of a PSD permit. 42 U.S.C. § 7604.

39. The CAA defines "person" as "an individual, corporation, partnership, association…." 42 U.S.C. § 7602(e).

40. Each Plaintiff is a "person" within the meaning of 42 U.S.C. § 7602(e) and 42 U.S.C. § 7604(a).

41. Each Defendant is a "person" within the meaning of 42 U.S.C. § 7602(e) and 42 U.S.C. § 7604(a).

12

## National Emission Standards for Hazardous Air Pollutants (NESHAPs)

42.     Congress established a list of 188 hazardous air pollutants ("HAPs") believed to cause adverse health or environmental effects in the CAA. 42 U.S.C. § 7412(b). US EPA periodically reviews the list of hazardous air pollutants and, where appropriate, revises the list by rule. 42 U.S.C. § 7412(b)(2).

43.     CAA Section 7412 requires US EPA to publish a list of all categories and subcategories of major sources and certain area sources of the HAPs and promulgate regulations establishing emissions standards for each. 42 U.S.C. § 7412. These emission standards are called the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories (40 C.F.R. Part 63). Coke oven batteries are regulated under the NESHAPs.

44.     Under CAA Section 7412, US EPA promulgated the National Emission Standards for Coke Oven Batteries (40 CFR Part 63, Subpart L) and the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 C.F.R. Part 63, Subpart CCCCC).

45.     The Facility is subject to and must comply with the NESHAPs in 40 C.F.R. Part 63, including inter alia, Subparts L and CCCCC.

46.     The citizen suit provision of the CAA authorizes "any person" to commence a civil action against "any person" who is alleged to have violated or to be in violation of any requirement under section 7412 of the CAA. 42 U.S.C. § 7604(f)(3).

13

**DEFENDANTS' RELEASES**

47.     As a result of the Facility's operations, large quantities of Noxious and Hazardous Substances, including NAAQS pollutants and HAPs, are released and emitted. The harmful effects associated with these and other Noxious and Hazardous Substances released from the Facility are well known.

48.     For example, $NO_x$ has numerous adverse effects on health, welfare, and the environment. $NO_x$ reacts with other pollutants and sunlight to form ground-level ozone, which scientists have long recognized as being harmful to human health and the environment. Ozone can cause decreases in lung function (especially among children who are active outdoors) and respiratory problems leading to increased hospital admissions and emergency room visits. Ozone can cause inflammation and permanent damage to the human lung. In addition, ozone causes damage to vegetation.

49.     Nitrogen dioxide ("$NO_2$"), one type of $NO_x$, is a noxious and hazardous pollutant that can cause people to have difficulty breathing by constricting lower respiratory passages. It may also weaken a person's immune system, causing increased susceptibility to pulmonary and other forms of infections. While children and asthmatics are the primary sensitive populations, individuals suffering from bronchitis, emphysema, and other chronic pulmonary diseases have a heightened sensitivity to $NO_2$ exposure.

50.    Emissions of sulfur dioxide ($SO_2$) and $NO_x$ form fine nitrate and sulfate particles. Inhalation of these fine particles is associated with respiratory distress, cardiovascular disease, and premature mortality.

51.    Particulate matter is the term for solid or liquid particles found in the air. Particulate matter with a diameter of 10 micrometers or less is referred to as "$PM_{10}$." Particulate matter with a diameter of 2.5 micrometers or less is referred to as "$PM_{2.5}$." Breathing air containing $PM_{10}$ or $PM_{2.5}$ increases the incidence of premature death, cancer, respiratory disease, and lung damage. $PM_{2.5}$ poses an especially great risk to health because the particles can become lodged deep into the lungs and may enter the bloodstream. $PM_{2.5}$ can cause or aggravate respiratory diseases, such as asthma and bronchitis. In fact, there is no safe level of exposure to $PM_{2.5}$. The elderly, children, and people with chronic lung disease, influenza, or asthma, tend to be especially sensitive to the effects of $PM_{2.5}$ and $PM_{10}$.

52.    Emissions of carbon monoxide (CO) can cause harmful health effects by reducing oxygen delivery to the body's organs (including the heart and brain) and tissues. The adverse health effects from lower levels of CO are most serious for those who suffer from cardiovascular diseases such as clogged arteries, angina, or congestive heart failure.

53.    Coke oven emissions, including benzene, released from the Facility are known Class A human carcinogens or are extremely toxic, even at low levels. Exposure

to coke oven emissions through inhalation may cause an increase in cancer of the lung, trachea, bronchus, kidney, prostate and other sites of the human body.

54.     Benzene, a component of coke oven emissions, is a known human carcinogen for all routes of exposure based upon convincing human evidence, as well as supporting evidence from animal studies. Benzene also has adverse effects on the respiratory system, blood, and central nervous system, and causes leukemia by having an effect on the bone marrow. Exposure to benzene can cause dizziness, lightheadedness, headaches, vomiting, and irritation of the skin, nose, throat, and eyes; and increases the risk of leukemia, bone marrow damage, chromosome damage, increased white blood cell count, damage to the human reproductive system, adverse neurological effects and other adverse health effects.

55.     Mercury is a neurotoxin that disrupts the nervous system, damages brain functions, and causes DNA and chromosomal damage, allergic reactions (resulting in skin rashes, tiredness, and headaches), and negative reproductive effects, such as birth defects and miscarriages. It is persistent, bioaccumulative, and adversely impacts biota. Additionally, mercury increases the risk of nervous system damage and birth defects in humans consuming fish that have accumulated mercury.

56.     Dioxins are persistent, bioaccumulative, and have been characterized by EPA as likely human carcinogens. Adverse non-cancer health effects from dioxins have been observed both in animals and in humans, including changes in hormone systems,

alterations in fetal development, reduced reproductive capacity, and immunosuppression.

57. Certain types of PAHs are known human carcinogens and carcinogenic in experimental animals. For example, benzo(a) pyrene and chrysene are probable human carcinogens. PAHs are persistent in the environment and arise from the incomplete combustion of organic material. They are potent inducers of hepatic enzymes and interact with DNA to induce neoplasms.

58. Breathing vapors with creosotes, coal tar, coal tar pitch, or coal tar pitch volatiles can cause irritation of the respiratory tract. Long-term exposure to even lower levels of coal tar creosote, coal tar, coal tar pitch, or coal tar pitch volatiles by skin or air contact can cause skin damage such as blistering or peeling. The International Agency for Research on Cancer (IARC) has determined that coal tar creosote is probably carcinogenic to humans. The US EPA has also determined that coal tar creosote is a probable human carcinogen. Long-term exposure to low levels of coal tar creosote has been found to cause skin cancer and cancer of the scrotum.

59. Arsenic is a known human carcinogen through the inhalation route of exposure and has been found to increase the risk of lung, liver, kidney, bladder, and skin cancer.

60. Chromium is a known human carcinogen through the inhalation route of exposure and has been found to increase the risk of lung cancer.

61.    Lead can harm nearly every organ and system in the human body. Children are the most susceptible.

62.    Hydrochloric acid and sulfuric acid are corrosive and can cause difficulty breathing and nasal and respiratory irritation when inhaled.

63.    Volatile organic compounds released by the Facility, such as hexane and toluene, are toxic to the respiratory and neurologic systems.

64.    In addition, many of these air contaminants, substances, and combinations of substances released from the Facility are known to damage property.

65.    Paragraphs 47 through 64 of this Complaint provide a non-exhaustive list of the adverse health and environmental effects that Noxious and Hazardous Substances being released from the Facility can have and are having on human health, welfare, and the environment, including flora and fauna.

**DEFENDANTS' UNLAWFUL CONDUCT AND THE CONSEQUENCES OF SUCH CONDUCT**

66.    The Facility's operations, including but not limited to: coal and coke storage piles; coal handling, processing, and transfer operations; coke and breeze handling, processing, and transfer operations; operation of 200 coke ovens; and quenching operations, cause or allow Noxious and Hazardous Substances to be released into the open air and deposited onto neighboring properties, including Plaintiffs' properties.

67. Defendants have knowingly, intentionally, wantonly, recklessly, and/or negligently caused or allowed Noxious and Hazardous Substances to be released from the Facility, directly resulting in Plaintiffs' exposure to and injury to their properties. In particular, Defendants have caused or allowed Noxious and Hazardous Substances to be released from the Facility in such a manner or in such amounts as to injure or endanger the health, comfort, safety or welfare of the public or cause unreasonable injury or damage to property.

68. Exposure to the Noxious and Hazardous Substances released from the Facility, including the Visible Deposits, has caused, and continues to cause, Plaintiffs and other area residents to experience coughing, gagging, nausea or vomiting, heartburn, burning or irritated eyes, sinus drainage and congestion, shortness of breath, vertigo, headaches, including migraine-like headaches, scratchy throats, phlegm, and an unpleasant, foreign taste in the mouth or back of the throat.

69. The Facility frequently and often without warning emits and releases visible grey, brown, black, yellowish, or blueish plumes, clouds, or hazes at and/or around the Facility, including the zone where Plaintiffs and their properties are located. In addition, the Facility frequently and often without warning emits odors that include burnt-rubber odors, sulfur odors, a rotten egg odor, chemical odor, coal odor, tar odor, and coke oven odors. These plumes, clouds, hazes, and odors contain Noxious and

Hazardous Substances and have repeatedly touched the ground at one or more of Plaintiffs' properties and other properties in the area.

70.     In fact, in the operation of the Facility, Defendants have allowed and continue to allow the release of plumes, clouds, and haze containing Noxious and Hazardous Substances, including the Visible Deposits, from the Facility. Such releases contain concentrations of $PM_{2.5}$ at levels that present a threat to health, comfort, and welfare.

71.     Defendants have frequently and often without warning unlawfully, knowingly, intentionally, wantonly, recklessly, and/or negligently prematurely removed coke from ovens before burning off all the volatiles, resulting in "green pushes" or "green ovens." Pushing a green oven can result in emissions with up to 1,000 times the level of volatiles, coke oven emissions constituents, and other air toxins than a non-green push.

72.     In the Plaintiffs' experience, green oven pushes have distinctive black or yellowish clouds, particulate and gaseous emissions, and odors that escape from the Facility's ovens and quenching operations. Odors from green pushes are noticeably more strong and pungent and exposure symptoms from such releases are much more severe.

73.     Following the release of Noxious and Hazardous Substances from the Facility, Visible Deposits invade and accumulate on the neighboring properties,

including Plaintiffs' properties. The Visible Deposits accumulate on homes, animals, trees, crops, porches, cars, outdoor furniture, decks, lawns, barns, and swimming pools in close proximity to the Facility, including Plaintiffs' properties. The release of Noxious and Hazardous Substances has frequently occurred and continues to occur frequently.

74.     The Noxious and Hazardous Substances, including the Visible Deposits, have caused and continue to cause unreasonable injury and substantial damage to the Plaintiffs' property, have interfered and continue to interfere with the use and enjoyment of their property, and have endangered or injured the health, comfort, safety or welfare of the public, including Plaintiffs, and continue to do so.

75.     Exposure to the Facility's releases leads the Sampsons to suffer coughing, gagging, nausea or vomiting, burning or irritated eyes, sinus drainage and congestion, shortness of breath, headaches, including migraine-like headaches, scratchy throats, phlegm, and an unpleasant, foreign taste in the mouth or back of the throat. The Sampsons have restricted outdoor activities, no longer use their enclosed porch, and refrain (as much as possible) from opening their windows. Despite these measures, particularly strong odors, clouds, and substances from the Facility still invade their home.

76.     The Plaintiffs are concerned and apprehensive about risks to their and their family members' health from their past and ongoing exposure to Facility releases. The Sampsons and Gannons are also concerned and apprehensive about their own

health conditions deteriorating, threatened impairments to their immune systems, and developing cancer or other serious diseases or illnesses.

77.     The Sampson Plaintiffs are particularly concerned and apprehensive about risks of harm to their children and grandchildren from exposure to Noxious and Hazardous Substances from the Facility, including the Visible Deposits.

78.     In addition, the Sampsons are concerned and apprehensive that the health condition of the grandson who lives with them has deteriorated and will continue to deteriorate due to his exposure to Noxious and Hazardous Substances from the Facility, including the Visible Deposits.

79.     Because the Visible Deposits frequently accumulate on their property, the Sampsons are forced to spend a significant amount of time each week (and sometimes daily) cleaning and removing Visible Deposits from their porches, patios, window sills, door tracks, siding, and other outdoor areas to make the areas partially usable for their intended purposes. For example, outdoor furniture must be wiped off each time Mr. or Mrs. Sampson, a family member, or a guest wishes to sit on it.

80.     Due to the nature of the Visible Deposits, the Sampsons have expended increased effort, resources, and time to clean the property. Further, the Visible Deposits have damaged the Sampsons' property. For example, a normal garden hose with normal water pressure is no longer sufficient to clean the deck or the siding on the Sampsons' home; the black material can only be washed with a pressure washer and

must also be hand-scrubbed. The Sampsons are unable to remove the Visible Deposits from their gutters.

81.    The Visible Deposits have invaded and damaged the inside of the Sampsons' home and they refrain (as much as possible) from opening their windows and doors to reduce the accumulation of Visible Deposits in their homes. The Sampsons struggle to keep the inside of their home clean and must change HVAC filters much more often.

82.    In addition, because the Visible Deposits have formed and continue to form a thick build-up on the Sampsons' pool floor and pool cover, opening the pool each spring requires tremendous effort—it takes nearly two weeks to get the pool in a somewhat usable condition and the concrete must be re-stained each year.

83.    The Sampsons also no longer consume the produce their grandson grows on the property.

84.    Exposure to the Facility's releases leads the Gannons to suffer coughing, gagging, nausea or vomiting, heartburn, burning or irritated eyes, sinus drainage and congestion, shortness of breath, vertigo, headaches, including migraine-like headaches, scratchy throats, phlegm, and an unpleasant, foreign taste in the mouth or back of the throat. Mrs. Gannon often must wear a mask to tolerate being outside, the Gannons have restricted outdoor activities, no longer use and enjoy their enclosed porch, and Mrs. Gannon no longer maintains her flower beds. In addition, the Gannons refrain (as

23

much as possible) from opening their windows, but particularly strong odors still invade their home and have even woken them up in the middle of the night. The Gannon Plaintiffs are also particularly concerned and apprehensive about the risks of harm to their children and grandchildren from exposure to Noxious and Hazardous Substances from the Facility, including the Visible Deposits. In fact, the Gannons no longer allow their children or grandchildren to visit their property for extended visits.

85.    Because the Visible Deposits frequently accumulate on their property, the Gannons are forced to spend a significant amount of time each week (and sometimes daily) cleaning and removing Visible Deposits from their porches, railings, window sills, door tracks, siding, and other outdoor areas to make the areas partially usable for their intended purposes. The frequent accumulation caused Mrs. Gannon to stop hanging laundry outside. Because the Visible Deposits accumulate so quickly after cleaning, Mrs. Gannon has recently given up attempting to keep the exterior of the house and the enclosed porch as clean as she once did. The Visible Deposits have damaged the Gannons' property and the structures on the property.

86.    The Gannons have been forced to expend increased effort, resources, and time to clean the property. The Visible Deposits that accumulate on the Gannons' vehicles adhere to the cars and cannot be scrubbed off. The Visible Deposits have damaged the paint on at least one car.

87.     The Visible Deposits have invaded and damaged the inside of the Gannons' home and they refrain (as much as possible) from opening their windows and doors to reduce the accumulation of Visible Deposits in their homes. The Gannons struggle to keep the inside of their home clean. Mrs. Gannon feels like her home is never clean.

88.     Visible Deposits accumulate on the Gannons' pet goats and on the land and water where the goats live. The Gannons are concerned for the health and welfare of the goats because the Visible Deposits have invaded and accumulated inside the fabric shed where hay for the goats is stored and the goats suffer from eye irritation and constantly have runny noses because of their exposure to Noxious and Hazardous Substances from the Facility.

89.     The Noxious and Hazardous Substances on Plaintiffs' properties have contaminated and continue to contaminate Plaintiffs' property, including the air. Defendants have failed to prevent and/or remediate this contamination.

90.     Plaintiffs are exposed to Noxious and Hazardous Substances, including Visible Deposits.

91.     As a direct and proximate result of the release of Noxious and Hazardous Substances from the Facility, including Visible Deposits, Plaintiffs are no longer able to take pride in the condition of their properties.

92.     Thus, as a direct and proximate result of the release of Noxious and Hazardous Substances from the Facility, including the Visible Deposits, the Plaintiffs have incurred and will continue to incur substantial damage to their properties.

93.     Despite stories of operational improvements, the conditions referenced herein have continued and grown worse over the past two years.

94.     Defendants knew or should have known of the danger posed to persons and the environment by the Noxious and Hazardous Substances which were emitted, released and otherwise disposed of in the neighboring community from the Facility.

95.     For example, Defendants submit annual reports, which are certified to be true, accurate, and complete, to the Ohio EPA showing that the Facility emits thousands of tons of air contaminants, including NAAQS pollutants and toxic metals, into the air each year.

96.     Defendants knew or should have known that the releases of Noxious and Hazardous Substances were likely to cause and have caused changes detrimental to the quality of the physical and human environment surrounding the Facility.

97.     As a direct and proximate result of the Facility's release of Noxious and Hazardous Substances, including the Visible Deposits, there is an increase in both cancer and non-cancer risks to the Plaintiffs and other members of the public who are exposed or may be exposed to such substances, via vast routes of exposure, including inhalation, and thus may present an endangerment to health.

98. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have and/or will, inter alia:

a. suffer damage to their properties (and to flora and fauna on their properties, including trees, chickens, turkeys, a hog, and goats), including but not limited to, a reduction in the value of their properties, damage to the residue of their properties, damage and/or injury to structures on their property, damage from the wrongful taking of their properties, and the loss of use of their properties;

b. incur substantial damage to their properties;

c. suffer damage to their personal property, including damage to vehicles;

d. be deprived of the ability to use and enjoy, fully, their property without risking harm to themselves or others;

e. continue to suffer annoyance, worry, anxiety, fear, inconvenience, injury, discomfort, including physical discomfort, serious emotional distress and apprehension about their and their family members' health, mental anguish, loss of enjoyment of life, and fear of future disease;

f. have their comfort, health, welfare, and safety endangered;

g. incur costs attempting to make their property usable for its intended purposes, including attempting to clean up the Visible Deposits;

h. incur costs to restore their property to the condition before the property was damaged;

i. suffer repeated exposure to the Noxious and Hazardous Substances from the Facility, increasing or accelerating the threat of future disease and/or the aggravation of existing conditions/diseases; and

j. incur attorney fees, expert fees, and other litigation costs and expenses.

99. The precise amount of the compensatory damages outlined in the preceding paragraph will be proven with specificity at trial but currently exceed $850,000 for each family, exclusive of interest, fees, and costs.

## CLAIMS AGAINST ALL DEFENDANTS

100. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

101. Defendants have frequently violated and will foreseeably continue to frequently violate the emission limits and operational standards in the Facility's PSD Permit. Collectively, these violations demonstrate the Defendants' wanton and reckless operation of the Facility, which releases Noxious and Hazardous Substances, in clear violation of law and regulation. Due to the violations set forth in the First through Twenty-Fifth Claims for Relief in this Complaint, Plaintiffs are entitled to injunctive relief and litigation costs under 42 U.S.C. § 7604. Further, the Court should issue an order requiring Defendants to pay civil penalties.

**First Claim for Relief - Violations of the Air Pollution Nuisance Prohibition in the PSD Permit and Ohio SIP, O.A.C. § 3745-15-07**

102.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

103.    Under O.A.C. § 3745-15-07:

… the emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, odors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

104.    O.A.C. § 3745-15-07 was approved by US EPA as part of the Ohio SIP on October 12, 1984. Additionally, compliance with the nuisance prohibition of O.A.C. § 3745-15-07 is an enforceable term of the Facility's PSD Permit. O.A.C. § 3745-15-07 is therefore federally enforceable by Plaintiffs through the Ohio SIP and under the Facility's permits.

105.    In 2015, Ohio EPA revised O.A.C. § 3745-15-07 to clarify the rule without changing the intent of the rule. Under the revised O.A.C. § 3745-15-07 (effective July 20, 2015):

(A) The emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

29

(B) The emission or escape into the open air from any source or sources of odors whatsoever that is subject to regulation under Chapter 3745-17, 3745-18, 3745-21, or 3745-31 of the Administrative Code and is operated in such a manner to emit such amounts of odor as to endanger the health, safety, or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

The Facility is subject to regulation under Chapter 3745-17, 3745-18, 3745-21, or 3745-31 of the Administrative Code. This revised nuisance provision is federally enforceable by Plaintiffs under the Facility's permits.

106.    The Ohio air nuisance prohibition in O.A.C. § 3745-15-07 constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f).

107.    Each Defendant is a "person" under O.A.C. § 3745-15-07. O.A.C. 3745-15-01(U).

108.    The emissions from the Facility, as described herein, have been and continue to be released in such a manner or in such amounts as to endanger the health, safety or welfare of the public, including Plaintiffs, and have and continue to cause unreasonable injury or damage to property, including Plaintiffs' property.

109.    For example, Noxious and Hazardous Substances, including the Visible Deposits, emitted from the Facility have created conditions that endanger the Plaintiffs' health, safety, and welfare and have caused unreasonable injury or damage to Plaintiffs' properties on, at least, the following exemplar dates: 9/4/2014; 9/10/2014; 9/17/2014; 9/20/2014; 10/7/2014; 10/14/2014; 10/15/2014; 10/17/2014; 11/3/2014; 11/4/2014; 11/11/2014;

11/18/2014; 11/22/2014; 11/24/2014; 12/27/2014; 1/17/2015; 2/7/2015; 2/8/2015; 2/15/2015;

3/7/2015; 3/8/2015; 3/13/2015; 3/16/2015; 3/21/2015; 3/26/2015; 4/2/2015; 4/3/2015;

4/5/2015; 4/7/2015; 4/8/2015; 4/9/2015; 4/12/2015; 4/13/2015; 5/3/2015; 5/4/2015; 5/5/2015;

5/10/2015; 5/11/2015; 5/12/2015; 5/15/2015; 5/24/2015; 5/25/2015; 5/26/2015; 5/29/2015;

6/9/2015; 6/10/2015; 6/11/2015; 6/12/2015; 6/13/2015; 6/18/2015; 6/21/2015; 6/22/2015;

6/23/2015; 7/9/2015; 7/17/2015; 8/19/2015; 9/14/2015; 10/8/2015; 10/13/2015; 11/4/2015;

11/5/2015; 11/11/2015; 11/19/2015; 12/4/2015; 12/6/2015; 12/12/2015; 12/21/2015; 1/14/2016;

1/30/2016; 2/5/16; 2/17/2016; 2/19/2016; 2/28/2016; 3/1/2016; 3/7/2016; 3/8/2016; 3/16/2016;

3/22/2016; 3/26/2016; 3/30/2016; 4/3/2016; 4/4/2016; 4/6/2016; 4/22/2016; 5/1/2016;

5/7/2016; 5/10/2016; 5/12/2016; 5/13/2016; 5/19/2016; 5/20/2016; 5/23/2016; 5/24/2016;

5/26/2016; 5/27/2016; 6/5/2016; 6/6/2016; 6/10/2016; 6/20/2016; 6/21/2016; 7/8/2016;

7/12/2016; 7/13/2016; 7/18/2016; 7/24/2016; 7/28/2016; 8/12/2016; 8/20/2016; 8/23/2016;

8/25/2016; 9/9/2016; 9/22/2016; 9/27/2016; 9/28/2016; 9/29/2016; 9/30/2016; 10/5/2016;

10/7/2016; 10/12/2016; 10/16/2016; 10/18/2016; 10/19/2016; 10/23/2016; 10/25/2016;

10/28/2016; 11/1/2016; 11/2/2016; 11/3/2016; 11/5/2016; 11/8/2016; 11/10/2016; 11/16/2016;

11/18/2016; 11/22/2016; 11/28/2016; 11/29/2016; 12/3/2016; 12/5/2016; 12/9/2016;

12/17/2016; 12/23/2016; 12/31/2016; 1/12/2017; 1/14/2017; 1/17/2017; 1/20/2017; 1/25/2017;

1/27/2017; 1/29/2017; 2/6/2017; 2/7/2017; 2/11/2017; 2/17/2017; 2/24/2017; 2/28/2017;

3/7/2017; 3/8/2017; 3/9/2017; 3/11/2017; 3/13/2017; 3/16/2017; 3/22/2017; 3/24/2017;

3/25/2017; 3/26/2017; 3/30/2017; 3/31/2017; 4/8/2017; 4/9/2017; 4/10/2017; 4/15/2017;

4/16/2017;  4/18/2017;  4/19/2017;  4/20/2017;  4/21/2017;  4/22/2017;  4/23/2017;  4/25/2017;

4/26/2017;  4/28/2017;  4/29/2017;  4/30/2017;  5/10/2017;  5/11/2017;  5/13/2017;  5/15/2017;

5/16/2017;  5/17/2017;  5/18/2017;  5/19/2017;  5/24/2017;  5/25/2017;  5/26/2017;  5/27/2017;

5/28/2017;  5/29/2017;  5/31/2017;  6/3/2017;  6/9/2017;  6/12/2017;  6/13/2017;  6/14/2017;

6/16/2017;  6/17/2017;  6/18/2017;  6/23/2017;  7/3/2017;  7/8/2017;  7/10/2017;  7/12/2017;

7/15/2017;  7/17/2017;  7/18/2017;  7/19/2017;  7/21/2017;  7/22/2017;  7/24/2017;  7/25/2017;

7/26/2017;  7/27/2017;  8/4/2017;  8/7/2017;  8/9/2017;  8/10/2017;  8/11/2017;  8/12/2017;

8/14/2017;  8/16/2017;  8/19/2017;  8/20/2017;  8/22/2017;  8/25/2017;  8/26/2017;  8/28/2017;

8/29/2017;  8/30/2017;  9/2/2017;  9/3/2017;  9/4/2017;  9/5/2017;  9/6/2017;  9/11/2017;

9/13/2017;  9/14/2017;  9/16/2017;  9/17/2017;  9/18/2017;  9/20/2017;  9/21/2017;  9/22/2017;

9/24/17; 9/25/17; and 9/29/2017.

110.    The emissions from the Facility are an ongoing public air nuisance and violate Ohio's prohibition against air pollution nuisances, O.A.C. § 3745-15-07. Therefore, Plaintiffs are entitled to injunctive relief and litigation costs under 42 U.S.C. § 7604. Further, the Court should issue an order requiring Defendants to pay civil penalties for such air pollution nuisance.

**Second Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to visually inspect each oven prior to pushing and pushing without visual inspection (P901 and P902)**

111.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

32

112.     The Facility's PSD Permit and the NESHAPs (40 C.F.R. § 63.7293(a)) require Defendants to: (1) visually inspect each oven prior to pushing by opening the door damper and observing the bed of coke; and (2) not push the oven unless the visual inspection indicates that there is no smoke in the open space above the coke bed and that there is an unobstructed view of the door on the opposite side of the oven.

113.     Each of these requirements is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

114.     Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit and the NESHAPs by failing to conduct the required visual inspection prior to pushing coke, resulting in an unobserved green push, and by pushing ovens without the visual inspection indicating that there is no smoke in the open space above the coke bed and that there is an unobstructed view of the door on the opposite side of the oven. For example, Defendants failed to adhere to these requirements on, at least, the following dates: 9/17/2014; 9/20/2014; 10/7/2014; 11/3/2014; 11/11/2014; 11/24/2014; 2/15/2015; 6/10/2015; 10/13/2015; 10/25/2015; 1/30/2016; 10/28/2016; 11/2/2016; 11/3/2016; 11/5/2016; 11/16/2016; 11/28/2016; 12/9/2016; 12/23/2016; 1/17/2017; 1/27/2017; 2/7/2017; 3/11/2017; 3/16/2017; 3/25/2017; 4/10/2017; 4/16/2017; 4/18/2017; 4/19/2017; 5/10/2017; 5/11/2017; 7/21/2017; 8/4/2017; 8/19/2017; 8/20/2017; 8/22/17; 8/26/2017; 8/29/2017; 9/4/2017; 9/6/2017; and 9/25/2017. Each such failure is a

violation of the Facility's PSD Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

115.    The frequent green-pushing events, among other acts and/or omissions of the Defendants, have led and will continue to lead to odors and/or associated coughing, gagging, nausea or vomiting, heartburn, burning or irritated eyes, sinus drainage and congestion, shortness of breath, vertigo, headaches, including migraine-like headaches, scratchy throats, phlegm, and an unpleasant, foreign taste in the mouth or back of the throat for area residents, including Plaintiffs, if the relief requested herein is not fully granted.

**Third Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to operate and maintain an emission control system for the capture and collection of emissions in a manner consistent with good air pollution control practices for minimizing emissions from the charging operation (P901 and P902)**

116.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

117.    The PSD Permit and the NESHAPs (40 C.F.R. § 63.303(b)(2)) require the Facility to install, operate and maintain an emission control system for the capture and collection of emissions in a manner consistent with good air pollution control practices for minimizing emissions from the charging operations.

118.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

119.   Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit and NESHAPs by failing to operate and maintain an emission control system for the capture and collection of emissions from the charging operations in a manner consistent with good air pollution control practices. For example, on P901, Defendants failed to operate and maintain the emission control system from the charging operations in a manner consistent with good air pollution control practices on at least the following dates during charging of the following ovens: Oven 93 on July 17, 2013; Oven 85 on August 22, 2013; Oven 99 on August 26, 2013; Oven 96 on September 10, 2013; Oven 100 on September 10, 2013; Oven 16 on October 20, 2013; Oven 32 on October 20, 2013; Oven 96 on October 22, 2013; Oven 21 on October 29, 2013; Oven 23 on October 29, 2013; Oven 15 on November 8, 2013; Oven 59 on November 8, 2013; Oven 80 on December 13, 2013; Oven 86 on January 16, 2014; Oven 100 on February 9, 2014; Oven 71 on March 26, 2014; and Oven 92 on July 14, 2015. For P902, this requirement was violated on at least the following dates during charging of the following ovens: Oven 126 on July 12, 2013; Oven 126 on July 22, 2013; Oven 155 on August 26, 2013; Oven 121 on October 19, 2013; Oven 123 on November 8, 2013; Oven 107 on November 22, 2013; Oven 103 on November 28, 2013; Oven 140 on November 29, 2013; Oven 124 on December 5, 2013; Oven 160 on December 11, 2013; Oven 124 on February 1, 2014; Oven 107 on March 6, 2014; Oven 108 on March 23, 2014; and Oven 148 on November 11, 2015. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, the

NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Fourth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding the waste gas stack sulfur dioxide emissions limits (P901 and P902)**

120.     Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

121.     The PSD Permit limits sulfur dioxide emissions from the waste gas stacks to 192.0 pounds per hour, based on a 3-hour block average.

122.     This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

123.     Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD permit by exceeding the 192.0 pound per hour sulfur dioxide emissions limit.  For example, sulfur dioxide emissions exceeded the 192.0 pound per hour limit for one or more 3-hour blocks on at least the following dates for P901 and P902: July 26, 2013; August 22, 2013; October 7, 2013; October 20, 2013; December 14, 2013; February 10, 2014 (two 3-hour blocks); May 5, 2014; May 9, 2014; May 10, 2014; May 15, 2014; May 18, 2014; May 19, 2014 (two 3-hour blocks); May 21, 2014; June 10, 2014; June 25, 2014; July 13, 2014; September 22-24, 2014 (twelve 3-hour blocks); June 14, 2015; June 30, 2015; August 20, 2015; December 9, 2015 (two 3-hour blocks); January 25, 2016 (two 3-hour blocks); February 22, 2016; August 31, 2016 (P901); August 31, 2016 (P902); September 8, 2016; September 10, 2016 (two 3-hour blocks); September 11, 2016 (four 3-hour blocks);

September 22, 2016; October 3, 2016; October 4-5, 2016 (four 3-hour blocks); October 10-11, 2016 (five 3-hour blocks); November 25, 2016 (two 3-hour blocks); December 15, 2016; and February 28, 2017 (two 3-hour blocks). Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Fifth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for maintaining FGD baghouse pressure drops outside the specified permit range (P901 and P902)**

124.     Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

125.     The PSD Permit, effective November 10, 2008, requires that the pressure drops across the P901 and P902 Flue Gas Desulfurization (FGD) baghouses (also called the waste gas exhaust baghouses) be maintained within the range of 3 to 12 inches of water. The PSD Permit was modified, effective February 19, 2015, to revise the required pressure drop range to 3 to 15 inches of water.

126.     This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

127.     Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit by failing to maintain the pressure drop on the FGD baghouses within the required ranges. For example, the pressure drop across the P901 FGD baghouse was outside the effective specified range on at least the following dates:

January 18, 2016; June 4, 2016; July 14, 2016; July 26, 2016; August 31, 2016; September 12, 2016; October 18, 2016; October 29, 2016; November 3, 2016; December 19, 2016; and March 4, 2017 and the pressure drop across the P902 FGD baghouse was outside the effective specified range on at least the following dates: November 19, 2013; November 24, 2013; November 25, 2013; January 1, 2014; January 2, 2014; January 13, 2014; January 16, 2014; May 21, 2014; June 10, 2014; September 7, 2014; September 22, 2014; September 23, 2014; November 20, 2014; June 14, 2015; December 9, 2015; January 18, 2016; September 11, 2016; October 1, 2016; October 7, 2016; November 25, 2016; November 30, 2016; December 12, 2016; and February 15, 2017. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Sixth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to observe each coke oven door after charging and to record the oven number of any door from which visible emissions occur (P901 and P902)

128.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

129.    The PSD Permit and the NESHAPs (40 C.F.R. § 63.303(c)(1)) require the Facility to observe each coke oven door after charging and record the oven number of any door from which visible emissions occur.

130.    These requirements are each an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

131.    Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit and NESHAPs by failing to observe each coke oven door after charging and to record the oven number of any door from which visible emissions occur. For example, Defendants failed to observe each coke oven door after charging and to record the oven number of any door from which visible emissions occur for at least the following ovens on the following dates: Oven 88 on July 14, 2015; Oven 79 on August 4, 2015; Oven 87 on August 28, 2015; Oven 141 on September 15, 2015; Oven 18 on November 5, 2015; Oven 38 on November 5, 2015; Oven 58 on November 5, 2015; Oven 32 on December 3, 2015; Oven 12 on December 11, 2015; Oven 192 on January 22, 2016; Oven 93 on January 23, 2016; Oven 97 on January 23, 2016; and Oven 129 on January 23, 2016. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Seventh Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for violations of the requirement that no more than one bypass vent stack be open at a time (P901 and P902)**

132.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

133.    The PSD Permit only allows one bypass vent stack to be open (or, "in use") at P901 or P902 at any time.

134. This restriction is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

135. Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD permit prohibition on having more than one bypass vent stack in use at any time. For example, more than one bypass vent stack was in use at one time on at least the following dates: October 4, 2013; May 5, 2014; May 15, 2014; May 16, 2014; September 7, 2014; September 29, 2014; October 12, 2014; November 11, 2014; February 11, 2015; June 14, 2015; September 28, 2015; July 2, 2015; December 9, 2015; January 18, 2016; February 18, 2016; May 10, 2016; May 11, 2016; May 15, 2016; four times on August 2, 2016; September 1, 2016; September 11, 2016; October 29, 2016; November 3, 2016; December 12, 2016; March 1, 2017; and March 4, 2017. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Eighth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for maintaining coke crushing/screening baghouse pressure drops outside the specified permit range (F004)

136. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

137. The PSD Permit requires that the pressure drop across the coke crushing/screening baghouse be maintained within the range of 3 to 12 inches of water.

138. This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

139. Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit by failing to maintain the pressure drop across the coke crushing/screening baghouse within the range of 3 to 12 inches of water. For example, the pressure drop across the coke crushing/screening baghouse was outside the specified range on or between the following dates: at least once on October 29, 2014; at least once on November 6, 2014; at least 111 times between September 10, 2015 and October 20, 2015; at least once on March 6, 2016; at least once on April 29, 2016; and "multiple times" between June 21, 2016 and June 22, 2016. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Ninth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to clean the quench tower baffles once each day (P001 and P002)**

140. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

141. The PSD Permit and the NESHAPs (40 C.F.R. § 63.7295(b)(2)) require the Facility to wash the baffles in each quench tower once each day.

142. This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

143.     Defendants have violated, and will foreseeably continue to violate, the

PSD Permit and the NESHAPs by failing to wash the baffles in each quench tower once

each day. For example, Defendants failed to wash the baffles in the P001 quench tower

on at least November 7, 2015 and January 17, 2016 and failed to wash the baffles in the

P002 quench tower on at least August 15, 2014 and November 7, 2015. In addition, the

Responsible Parties failed to wash the P002 baffles on "at least 13 days" from August 6

through August 18, 2015 and failed to wash the P001 and P002 baffles on "…days going

back as early as October 2014." Each such failure is a violation of the Facility's PSD

Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief

requested herein is not fully granted.

**Tenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for
failure to process waste gas from coking by the use of a lime spray dryer and a
baghouse (P901 and P902)**

144.     Each of the allegations contained in the above paragraphs is incorporated

by reference as if fully set forth herein.

145.     The PSD Permit requires that waste gas from coking be processed by the

use of a lime spray dryer for $SO_2$ control and a baghouse for PM control.

146.     This requirement is an "emission standard or limitation" under 42 U.S.C. §

7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

147.     Defendants have repeatedly violated, and will continue to violate, the PSD

permit by failing to process waste gas from coking by the use of a lime spray dryer and

42

a baghouse. For example, Defendants failed to process waste gas from coking by the use of a lime spray dryer and a baghouse on at least the following dates for P901 or P902: April 1, 2015; April 13, 2015; June 15, 2015; December 9, 2015; January 18, 2016; April 1, 2016; May 10, 2016; May 11, 2016; September 11, 2016; October 7, 2016; November 29, 2016; February 27, 2017; and March 4, 2017. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Eleventh Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for failure to maintain daily inspection records of visible emissions and wind erosion for the open coal storage piles (F002)

148.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

149.    The PSD Permit requires the Facility to maintain daily inspection records of visible emissions and wind erosion for the open coal storage piles.

150.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

151.    Defendants have violated, and will foreseeably continue to violate, the PSD permit by failing to maintain the required daily inspection records. For example, Defendants failed to maintain the required daily inspection records from, at least, November 1, 2014 through November 30, 2014. Each such failure is a violation of the

Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Twelfth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for failure to record the pressure drop across the coke crushing/screening baghouse (F004)**

152.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

153.    The PSD Permit requires the pressure drop across the coke crushing/screening baghouse to be recorded on a once per shift basis.

154.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

155.    Defendants have violated, and will foreseeably continue to violate, the PSD Permit by failing to record the pressure drop across the coke crushing/screening baghouse on a once per shift basis. For example, Defendants failed to record the pressure drop across the coke crushing/screening baghouse during at least one shift on at least the following dates: June 1, 2013; June 2, 2013; October 11, 2013; August 2, 2014; and December 11, 2014. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Thirteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding the pounds of PM$_{10}$ per ton of coal emission limitation (P002)**

156. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

157. The PSD Permit limits the pounds of $PM_{10}$ emissions from the quench tower to 0.05 pounds per ton of coal.

158. This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

159. Defendants have violated, and will foreseeably continue to violate, the PSD permit by exceeding the 0.05 pounds of $PM_{10}$ per ton of coal emissions limitation. For example, this $PM_{10}$ limit was exceeded on, at least, October 5, 2016 and October 18, 2016. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Fourteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for violations of the prohibition on more than one coke oven door leak during a given oven's coking cycle (P901 and P902)**

160. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

161. The PSD Permit and the NESHAPs (40 C.F.R. § 63.303(c)(2)) prohibit more than one coke oven door leak during a given oven's coking cycle.

162. This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

163.     Defendants have violated, and will foreseeably continue to violate, the PSD Permit's and the NESHAPs' prohibition on more than one coke oven door leak during a given oven's coking cycle. For example, more than one coke oven door leak occurred during at least the following ovens' coking cycles on at least the following dates: Oven 20 on July 8, 2013; Oven 173 on February 12, 2014; Oven 1 on May 3, 2014; Oven 99 on July 27, 2015; and Oven 6 on August 15, 2015. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Fifteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding the maximum daily wet coal usage limit (P901)**

164.     Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

165.     The PSD Permit imposes a maximum daily wet coal usage rate of 2,400 wet tons per day for P901.

166.     This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

167.     Defendants have violated, and will foreseeably continue to violate, the PSD Permit by exceeding the maximum daily wet coal usage rate of 2,400 wet tons per day. For example, the 2,400 wet tons per day limit was exceeded on at least January 25, 2014 and March 15, 2014. Each such exceedance is a violation of the Facility's PSD

Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Sixteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for maintaining pushing charging machine baghouse pressure drops outside the specified permit range (P901)

168.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

169.    The PSD Permit requires that the pressure drop across the pushing charging machine (PCM) baghouse be maintained within the range of 3 to 12 inches of water.

170.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

171.    Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD permit by failing to maintain the pressure drop on the PCM baghouse within the required range. For example, the pressure drop across the PCM baghouse was outside the specified range on at least the following dates: April 9, 2013; April 10, 2013; April 11, 2013; April 12, 2013; April 13, 2013; April 14, 2013; April 19, 2013; and May 7, 2016. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Seventeenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding the visible particulate emissions limitations from the PCM baghouse (P901)**

172.     Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

173.     The PSD Permit prohibits visible particulate emissions from the PCM baghouse stack from exceeding 10% opacity as a 6-minute average.

174.     This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

175.     Defendants have violated, and will foreseeably continue to violate, the PSD permit by exceeding the PCM baghouse visible particulate emissions limit of 10% opacity as a 6-minute average. For example, the opacity limit was exceeded on at least June 26, 2015 and April 25, 2016. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Eighteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to operate and maintain air pollution control and monitoring equipment in a manner consistent with good air pollution control practices for minimizing emissions (P901 and P902)**

176.     Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

177. The PSD Permit and the NESHAPs (40 C.F.R. § 63.7300(a)) require the Facility to operate and maintain air pollution control and monitoring equipment in a manner consistent with good air pollution control practices for minimizing emissions.

178. This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

179. Defendants have violated, and will foreseeably continue to violate, the PSD Permit and the NESHAPs by failing to operate and maintain air pollution control and monitoring equipment in a manner consistent with good air pollution control practices for minimizing emissions. For example, the air pollution control and monitoring equipment for the capture and collection of emissions during pushing operations was not operated and maintained in a manner consistent with good air pollution control practices for minimizing emissions for P901 or P902 on at least the following dates: September 9, 2015; December 23, 2015; December 1, 2016; December 15, 2016; December 24, 2016; and January 9, 2017. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Nineteenth Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for maintaining common tunnel temperatures outside the specified permit range (P901 and P902)**

180. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

49

181.    The PSD Permit requires the Facility to operate and maintain the common tunnel temperatures at a minimum of 1,400 °F.

182.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

183.    Defendants have violated, and will continue to violate, the PSD Permit by failing to maintain the minimum common tunnel temperature. For example, Defendants failed to maintain the minimum common tunnel temperature on at least the following dates and times: January 7, 2014 at 4:28 pm; January 7, 2014 at 11:34 pm; January 7, 2014 at 10:34 pm; January 8, 2014 at 11:00 am; and "intermittently" from January 7, 2014 at 10:46 pm through January 8, 2014 at 4:01 pm. Each of these exceedances is a violation of the PSD Permit, the Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Twentieth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to operate the ovens under negative pressure (P901 and P902)**

184.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

185.    The PSD Permit and the NESHAPs (40 C.F.R. § 63.303(b)(1)) limit coke oven emissions from the non-recovery coke oven batteries to 0.0 percent leaking coke oven doors and require the Facility to monitor and record the pressure in each oven or in the common tunnel to ensure that the ovens are operated under a negative pressure.

186.    The Ohio air nuisance prohibition in O.A.C. § 3745-15-07 constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f).

187.    Defendants have repeatedly violated, and will continue to violate, the PSD Permit and the NESHAPs by failing to operate the ovens under negative pressure. For example, Defendants failed to maintain negative pressure in the ovens on at least the following dates: September 29, 2014; October 12, 2014; November 11, 2014; February 11, 2015; June 14, 2015; and January 18, 2016. Each such failure is a violation of the Facility's PSD Permit, Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Twenty-First Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding the visible particulate emissions limitations from the waste gas exhaust stacks (P901 and P902)**

188.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

189.    The PSD Permit prohibits visible particulate emissions from the P901 and P902 waste gas exhaust stacks from exceeding 10% opacity as a 6-minute average.

190.    This limit is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

191.    Defendants have violated, and will foreseeably continue to violate, the PSD Permit by exceeding the waste gas exhaust stacks visible particulate emissions limit of 10% opacity as a 6-minute average. For example, visible particulate emissions

exceeded 10% opacity as a 6-minute average from the waste gas exhaust stacks on at least March 30, 2015 and on December 17, 2016. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Twenty-Second Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for exceeding bypass venting limits (P901 and P902)

192. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

193. The PSD Permit limits venting from the P901 and P902 bypass vent stacks to 192 hours per vent stack per rolling 12-month period.

194. This limit constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

195. Defendants have violated, and will foreseeably continue to violate, the PSD permit by exceeding the bypass venting limit. For example, Defendants exceeded the bypass venting limit for at least 15 rolling months from at least December 2013 through June 2014 on P901 and from at least June 2014 through January 2015 on P902. Each such exceedance is a violation of the Facility's PSD Permit, Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Twenty-Third Claim for Relief - Violations of the PSD Permit, Ohio SIP, and the CAA for failure to operate the activated carbon injection system (P902)

196.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

197.    The PSD Permit requires operation and maintenance of an activated carbon injection system for the control of mercury emissions, which must be operated at all times when one or more of the associated P902 ovens are operated and in a manner that will maximize the removal efficiency for mercury.

198.    This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

199.    Defendants have violated, and will foreseeably continue to violate, the PSD permit by failing to operate and maintain an activated carbon injection system at all times when one or more of the associated ovens are operated and in a manner that will maximize the removal efficiency for mercury. For example, Defendants failed to operate the carbon injection system on at least the following dates: October 23, 2015; December 9, 2015; January 18, 2016; September 11, 2016; and December 12, 2016. Each of these failures is a violation of the PSD Permit, the Ohio SIP, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

**Twenty-Fourth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to record the pressure drop across each multiclone dust collector during the push of each oven (P901 and P902)**

200.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

201. The PSD Permit and the NESHAPs (40 C.F.R. §§ 63.7330, 63.7331(k)) require the pressure drop across each multiclone dust collector be measured and recorded during each push.

202. This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

203. Defendants have violated, and will foreseeably continue to violate, the PSD Permit by failing to measure and record the pressure drop across each multiclone dust collector during each push. For example, Defendants failed to record the pressure drop across the multiclone dust collector while pushing at least one P902 oven on, at least, August 17, 2013 and while pushing at least two P901 ovens on, at least, July 21, 2015. Each of these failures is a violation of the PSD Permit, the Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Twenty-Fifth Claim for Relief - Violations of the PSD Permit, Ohio SIP, the NESHAPs, and the CAA for failure to record the fan amp reading on each multiclone dust collector at least once every eight hours (P901 and P902)

204. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

205. The PSD Permit and the NESHAPs (40 C.F.R. § 63.7333(d)) require the fan amp reading be checked and recorded at least once every 8 hours on each multiclone dust collector.

206. This requirement is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

207. Defendants have repeatedly violated, and will foreseeably continue to violate, the PSD Permit and the NESHAPs by failing to check and record the fan amp reading on each multiclone dust collector at least once every 8 hours. For example, Defendants failed to record the fan amp reading at least once every 8 hours on at least the following dates: June 12, 2014; December 10, 2014; and January 1, 2015. Each of these failures is a violation of the PSD Permit, the Ohio SIP, the NESHAPs, and the CAA. Such violations will continue if the relief requested herein is not fully granted.

### Twenty-Sixth Claim for Relief - Negligence

208. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

209. At all times relevant herein, Defendants negligently caused or threaten to cause the contamination of the soil, surface water, sediment, groundwater, and air at and about the Facility, including the Plaintiffs' property, and failed to warn Plaintiffs of the contamination.

210. At all times relevant hereto, Defendants owed and owe a duty to Plaintiffs to inter alia:

a. Prevent Noxious and Hazardous Substances from the Facility from contaminating the environment, including the air, soil, ground, surface water, sediments and groundwater at and about the Plaintiffs' property;

b. Operate and maintain the Facility in a manner that would prevent Plaintiffs' exposure to the Facility's Noxious and Hazardous Substances;

c. Advise the potentially affected members of the public, including the Plaintiffs, of the degree of danger associated with the release of the Noxious and Hazardous Substances; and

211. Defendants knew or should have known that the releases of Noxious and Hazardous Substances were likely to cause and have caused changes detrimental to the quality of the physical and human environment surrounding the Facility.

212. Defendants have breached and will continue to breach the duties outlined above, resulting in substantial damage to Plaintiffs' property, Plaintiffs' exposure to Noxious and Hazardous Substances, and otherwise injuring the Plaintiffs, as set forth herein. Defendants have also failed to exercise the level of care that a careless person would use.

213. Defendants' conscious disregard for the rights and safety of Plaintiffs has caused substantial harm to Plaintiffs and their properties and has a great probability of causing further substantial harm.

214.    In addition, Defendants have breached the statutory duties prescribed by federal and state law, as set forth herein, and including by Ohio Revised Code ("R.C.") Chapters 3704 and 3767 and regulations promulgated thereunder. Violations of these standards give rise to negligence per se.

215.    As a direct and proximate result of the foregoing negligent and/or wanton and/or reckless acts or omissions of Defendants:

    a.   Plaintiffs' property has been harmed;

    b.   Plaintiffs have suffered loss of use and enjoyment of their properties, annoyance and discomfort, and mental anxiety and distress over future diseases, including cancer; and

    c.   Plaintiffs have suffered and will continue to suffer injuries and damages, as described herein.

216.    Said negligent conduct and resulting harms, injuries, and damages to Plaintiffs are reasonably certain to continue.

217.    Defendants are jointly and severally liable for all of said direct and consequential damages. Further, Defendants are jointly and severally liable for all special and punitive damages, as set forth herein.

## Twenty-Seventh Claim for Relief - Violations of the Public Nuisance Prohibition under Ohio law, R.C. § 3767.13

218.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

219. The emissions from the Facility, as described herein including noxious exhalations or noisome or offensive smells, have been and continue to be released in such a manner or in such amounts as to be injurious to the health, comfort, or property of individuals, including Plaintiffs, or of the public, including Plaintiffs, as confirmed by recent $PM_{2.5}$ data.

220. Thus, the emissions from the Facility constitute an ongoing public nuisance and are a violation of Ohio's prohibition against public nuisances, R.C. § 3767.13.

221. Under R.C. § 3767.13(A), "[n]o person shall erect, continue, use, or maintain a building, structure, or place for the exercise of a trade, employment, or business, … which, by occasioning noxious exhalations or noisome or offensive smells, becomes injurious to the health, comfort, or property of individuals or of the public."

222. Each Defendant is a "person" within the meaning of R.C. § 3767.13.

223. The Facility is a "building, structure, or place for the exercise of a trade, employment, or business" within the meaning of R.C. § 3767.13.

224. R.C. § 3767.03 authorizes "any person who is a citizen of the county in which the nuisance exists" to commence a civil action "to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it."

225. Each Plaintiff is a "person" within the meaning of R.C. § 3767.13. R.C. § 3767.01(B).

226.    Each Plaintiff is a citizen of Scioto County.

227.    The Facility is located in Scioto County.

228.    The public nuisance caused by Defendants is ongoing and Defendants will foreseeably continue to violate Ohio's prohibition against public nuisances. Therefore, Plaintiffs are entitled to injunctive relief under R.C. § 3767.

**Twenty-Eighth Claim for Relief - Nuisance**

229.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

230.    By wrongfully causing contamination of the air and depositing Noxious and Hazardous Substances on the Plaintiffs' properties, the Defendants' acts and omissions described herein amount to a private and public nuisance, both absolute and qualified, which has proximately injured, annoyed, and endangered the comfort, health, and safety of the Plaintiffs and rendered them insecure in their life and the use of their property.

231.    Defendants' ongoing tortious conduct and continuing intentional, unreasonable, unlawful, knowing, wanton, reckless, and/or negligent acts and omissions have caused and will continue to cause Noxious and Hazardous Substances, including Visible Deposits, to frequently escape from the Facility and invade, settle, and threaten to contaminate the air, ground, groundwater, surface water, soil, sediment, biota, and property of the Plaintiffs, rendering said property unfit.

232. The release of Noxious and Hazardous Substances from the Facility occurs frequently, often without warning, and at varying times of day or night. Defendants have had and continue to have control over the Facility, continuing to make numerous unsuccessful changes to the Facility that do not abate the releases of Noxious and Hazardous Substances or the violations of law alleged herein. Indeed, the facts show that conditions have worsened the past two years.

233. The acts and omissions of the Defendants were and are being conducted in a manner that constitutes a nuisance under Ohio law including, but not limited to, common law.

234. In addition, because the releases of Noxious and Hazardous Substances, including Visible Deposits, violate O.A.C. § 3745-15-07, Defendants' acts and omissions also constitute a public nuisance, including an absolute public nuisance. Plaintiffs have suffered injuries distinct from those suffered by the public at large, as set forth herein.

235. Defendants have and continue to negligently and carelessly cause the Noxious and Hazardous Substances, including the Visible Deposits, to harm the Plaintiffs' property, which has unreasonably and wrongfully deprived Plaintiffs of the ability to fully use and enjoy their property and has damaged Plaintiffs' property. Defendants' acts and omissions constitute a private nuisance.

236. The Defendants have also violated statutory duties prescribed by Federal and state law as set forth herein, including R.C. Chapters 3704 and 3767 and regulations

promulgated thereunder. These violations have proximately caused Plaintiffs to suffer annoyance, injury, and inconvenience and have endangered the comfort, health, and safety of the Plaintiffs. Violations of these statutory and regulatory standards also give rise to nuisance per se, also known as an absolute nuisance.

237.    Because the Defendants negligently and carelessly caused the Noxious and Hazardous Substances, including the Visible Deposits, to contaminate the Plaintiffs' property, the Defendants created a potential and unreasonable risk of harm, which, in due course, resulted in injury. The Defendants' acts and omissions also constitute a qualified nuisance.

238.    The Defendants knew or should have known of the Noxious and Hazardous Substances being released from the Facility. They failed to adequately warn the Plaintiffs of the adverse effects of those materials.

239.    As a direct and proximate result of Defendants' intentional, knowing, wanton and reckless and/or negligent creation of a nuisance:

   a.   Defendants have decreased the value of the property of the Plaintiffs;

   b.   Defendants have endangered the comfort, health, and safety of the Plaintiffs;

   c.   Plaintiffs have suffered annoyance, inconvenience, and other injuries;

   d.   Plaintiffs have suffered and will suffer increased risk of impaired health.

e. Plaintiffs' property and the environment have been harmed and will continue to be harmed;

f. The Plaintiffs have been deprived of use and enjoyment of their property;

g. Plaintiffs have suffered annoyance and discomfort, including physical discomfort; and

h. Plaintiffs have suffered and will suffer the other injuries and damages as set forth herein.

240. Said nuisance is reasonably certain to continue.

241. As long as the Defendants' nuisance continues, the damages and injuries to the Plaintiffs will continue.

242. The Defendants are jointly and severally liable for all direct and consequential damages and for such other relief as will abate and remediate the nuisance and its short-term and long-term effects. Defendants are also jointly and severally liable due to the harm posed by the past, present, and future nuisance, as provided by the Restatement of Torts (Second) § 929, including annoyance and discomfort damages, reduction in the value of Plaintiffs' properties and/or the costs to restore Plaintiffs' properties to their condition before the nuisance, and damages for loss of use of the properties for the period of the nuisance. Further, Defendants are jointly and severally liable for all special and punitive damages, as set forth herein.

**Twenty-Ninth Claim for Relief - Trespass**

243. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

244. Defendants, by the foregoing acts and omissions, caused and will continue to cause Noxious and Hazardous Substances, including the Visible Deposits, to escape from the Facility and to invade the air, ground, ground water, surface water, soils, sediments, biota and property of the Plaintiffs. Said invasion was or should have been reasonably foreseeable to Defendants.

245. Defendants were or should have been substantially certain that the release of Noxious and Hazardous Substances from the Facility would result in an invasion of Plaintiffs' properties.

246. Plaintiffs, who have never authorized said invasion of their property by these Noxious and Hazardous Substances, including Visible Deposits, have record title to and exclusive possession of the land invaded by the contaminants and have a property interest in the groundwater underlying that land.

247. The presence of these Noxious and Hazardous Substances, including Visible Deposits, on Plaintiffs' properties constitutes a continuing trespass. The Noxious and Hazardous Substances, including Visible Deposits, on Plaintiffs' properties, are present at levels that present a threat to health and welfare. Defendants' continued release of the Noxious and Hazardous Substances will further exacerbate the damage

resulting to Plaintiffs from the ongoing trespass. Defendants' tortious conduct, which is the direct and proximate cause of the trespass, continues.

248. Such trespass is reasonably certain to continue.

249. As a direct and proximate result of Defendants' intentional, knowing, wanton, reckless, and/or negligent acts and omissions:

a. Plaintiffs' land and the environment have been physically harmed and will continue to be harmed;

b. Plaintiffs' land and the environment have been substantially damaged and will continue to be substantially damaged;

c. Plaintiffs have suffered and continue to suffer actual and substantial interference with use and enjoyment of their properties and annoyance and discomfort; and

d. The Plaintiffs have suffered and will suffer the injuries and damages set forth herein.

250. As a direct and proximate result of Defendants' intentional, knowing, wanton, reckless, and/or negligent acts and omissions, Defendants are jointly and severally liable for direct and consequential damages resulting from said trespass and for such other relief as may be necessary to prevent and remediate the trespass. Defendants are jointly and severally liable for injury caused and/or the harm posed by the past, present, and future trespass to Plaintiffs' land, as provided by the Restatement

of Torts (Second) § 929, including damages for annoyance and discomfort, reduction in the value of Plaintiffs' properties and/or the costs to restore Plaintiffs' properties to their condition before the trespass, and damages for loss of use of the properties for the period of the trespass. Further, Defendants are jointly and severally liable for special damages that resulted from said trespass and for punitive damages, as set forth herein.

**Thirtieth Claim for Relief - Ultrahazardous or Abnormally Dangerous Activity**

251.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

252.    The Plaintiffs and their property have been exposed to and otherwise injured by Noxious and Hazardous Substances that have been released from the Facility as a direct and proximate result of the Defendants' acts and omissions. The disposal, storage, generation, handling and release of said Noxious and Hazardous Substances is an abnormally dangerous or ultrahazardous activity in which the Defendants are and have been engaged.

253.    By reason of carrying on such activities which directly, proximately and foreseeably caused the invasion of and substantial harm to the Plaintiffs' properties and the surrounding environment, each Defendant is strictly liable to the Plaintiffs even if they exercised the utmost care to prevent the harm, which the Defendants nonetheless failed to do.  This liability arises pursuant to the Restatement of Torts (Second) §§ 519 and 520.

254. The Defendants directly and proximately caused the injuries to the Plaintiffs described herein, including mental anguish, property damage, loss of enjoyment of life and property, annoyance and discomfort, and fear of future disease.

255. Defendants' conscious disregard for the rights and safety of Plaintiffs has caused substantial harm to Plaintiffs and their properties and has a great probability of causing further substantial harm. As a direct and proximate result of the contamination caused by Defendants' activities, the Plaintiffs suffered all of the injuries and damages described herein. The Defendants are jointly and severally liable for all such direct, consequential, special, and punitive damages, as set forth herein.

### **Thirty-First Claim for Relief - Negligent Infliction of Emotional Distress**

256. Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

257. As described herein, Defendants breached their duties owed to the Plaintiffs, causing Plaintiffs and their loved ones to be exposed and/or continue to be exposed to Noxious and Hazardous Substances, including the Visible Deposits.

258. As a direct and proximate result of the Defendants' continuing acts and omissions, and Plaintiffs' resulting exposure to the Noxious and Hazardous Substances released from the Facility, the Plaintiffs have suffered serious emotional distress, the effect of which continues until the present and will persist into the future. Plaintiffs' exposure and the exposure of their family members to Noxious and Hazardous

66

Substances have placed Plaintiffs and their family members in actual peril, of which Plaintiffs are aware and fearful.

259.    As a direct and proximate result of the Defendants' conduct and Plaintiffs' and their family members' exposure to Noxious and Hazardous Substances, the Plaintiffs suffer from fear, anxiety, and apprehension that said exposure is currently threatening their and their family members' health and will contribute to the development of future diseases and/or aggravate existing diseases and/or impairments.

260.    Given the well-known and documented effects of the Noxious and Hazardous Substances, the emotional distress, fear, anxiety, anguish, and apprehension that Plaintiffs have suffered and will continue to suffer is reasonable and was reasonably foreseeable to Defendants.

261.    The Defendants are jointly and severally liable for all damages, including special and punitive damages, as described herein.

### Thirty-Second Claim for Relief - Intentional Infliction of Emotional Distress

262.    Each of the allegations contained in the above paragraphs is incorporated by reference as if fully set forth herein.

263.    Through the acts and omissions described herein, Defendants intended to cause emotional distress to Plaintiffs and/or acted in a way that they knew or should have known would logically and naturally result in serious emotional distress. The

Defendants' conduct constitutes an unlawful interference with the personal and property rights of the Plaintiffs.

264.   The Defendants' conduct, including the release of Noxious and Hazardous Substances, despite knowing that such releases are occurring and knowing the well-documented health effects associated with such releases, was extreme and outrageous, intolerable by a reasonable person, reckless, willful, wanton, and/or negligent; went beyond all bounds of decency; and is intolerable in a civilized community. Defendants' conscious disregard for the rights and safety of Plaintiffs has caused substantial harm to Plaintiffs and their properties and has a great probability of causing further substantial harm.

265.   As a direct and proximate result of the Defendants' acts and omissions and the Plaintiffs' exposure to the Noxious and Hazardous Substances released from the Facility, including the Visible Deposits, the Plaintiffs have suffered severe and serious emotional distress, which no reasonable person could be expected to endure, the effect of which continues until the present and will persist into the future. As a direct and proximate result of the Defendants' conduct, the Plaintiffs have suffered and will continue to suffer from psychological injury, including, but not limited to, anguish, anxiety and apprehension over their health and the health of their loved ones who may suffer adverse physical effects from exposure to the Noxious and Hazardous Substances.

266. The Defendants' acts and omissions resulted in serious emotional distress and caused foreseeable and reasonable emotional injury to the Plaintiffs.

267. The Defendants are jointly and severally liable for all damages, including special and punitive damages, as described herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court issue an order and enter a judgment:

a. Finding that Defendants are jointly and severally liable for all damages, including special and punitive damages;

b. Granting injunctive relief compelling the Defendants (pursuant to a court ordered plan and with participation of the Plaintiffs): (1) to thoroughly and comprehensively investigate, test and assess (or fund an independent environmental investigation with participation by the Plaintiffs) the full nature and extent of the environmental contamination, including soil, sediments, surface water, groundwater, and air, created by Defendants; (2) to fully disclose to the public the full nature and extent of this contamination; and (3) to permanently remediate the areas adversely affected by the release of Noxious and Hazardous Substances;

c. Ordering Defendants to stop the threat of future migration or release of Noxious and Hazardous Substances from the Facility;

d.  Requiring the Defendants to fund a community-wide, comprehensive health investigation, health assessment and public health/medical monitoring program for those persons who reside or work in the vicinity of the Facility and who have been exposed to contaminants released by the Facility;

e.  Prohibiting the Defendants from maintaining a nuisance and trespass on Plaintiffs' properties, including: (i) requiring independent verification via the continuous monitoring of their Facility to ensure compliance; (ii) appointing a monitor or special master to ensure full compliance; and (iii) requiring further remediation of the harm caused by or contributed by the nuisance and trespass and the negligent acts of the Defendants;

f.  Granting Plaintiffs the right and the funding to have expert oversight over all relief granted by the Court;

g.  Declaring that Defendants have violated and are violating the CAA and the Ohio SIP, including the CAA's Prevention of Significant Deterioration program requirements, the approved PSD program requirements in the Ohio SIP, and the Ohio Air Nuisance Prohibition in O.A.C. § 3745-15-07;

h.  Declaring that Defendants have violated and are violating the Facility's air permits as set forth above;

i.  Enjoining Defendants to promptly take all steps necessary to comply with the foregoing laws, regulations, and the Facility's permits;

j.  Enjoining Defendants from operating their Facility except in accordance with the CAA, the Ohio SIP, and the Facility's permits;

k.  Assessing CAA civil penalties against Defendants;

l.  Retaining jurisdiction over this action to ensure compliance with and to oversee implementation of this Court's Order;

m.  Awarding Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

n.  Granting such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all the issues so triable.

Respectfully submitted,

s/ D. David Altman

D. David Altman (0021457), *Trial Attorney*
Justin D. Newman (0080968)
Robin A. Burgess (0096442)
D. DAVID ALTMAN CO., L.P.A.
15 East 8th Street, Suite 200W
Cincinnati, Ohio 45202
(513) 721-2180
Fax: (513) 721-2299
daltman@environlaw.com
*Attorneys for the Sampsons and Gannons*