## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| James Sampson, et al., | ) |
| | ) |
| **PLAINTIFFS** | )    **CASE NO. 1:17-cv-658** |
| | ) |
| **v.** | )    **Judge Michael R. Barrett** |
| | ) |
| SunCoke Energy, Inc., et al., | ) |
| | ) |
| **DEFENDANTS** | ) |

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs James (Jim) Sampson, Roberta (Bobbi) Sampson, Mary Gannon, and Brian Gannon respectfully move this Court for a preliminary injunction to prevent the ongoing irreparable harm that is befalling the Plaintiffs and other residents along Back Road as a result of the Haverhill coke plant's (the Coke Plant's) ongoing releases of toxic air pollution.

The attached declarations of Mary Gannon, Jim Sampson, renowned air pollution control and regulation expert William Auberle, and internationally prominent public health expert Dr. David O. Carpenter, along with site-specific particulate matter 2.5 data (PM2.5), amply demonstrate that the Plaintiffs are being exposed to severe, episodic releases of air pollution that threaten health and welfare. But, the Plaintiffs' factual pollution-related observations, Defendants' own emission information, and the scientific and environmental literature on coke plant emissions demonstrate that the

1

exposures of the Plaintiffs are not just single-substance exposures, but instead are a toxic swarm of metals, volatile organic compounds (VOCs), and other substances that have resulted in adverse health effects, including headaches, chest pains, respiratory irritation, difficulty breathing, and vertigo. These episodes, which can strike at any time, are ongoing and so frequent that the Plaintiffs' exposures are both acute (harmful individually) and chronic (harmful collectively over time). The PM2.5 data confirm the exposure pathway from the Coke Plant to Plaintiffs and elevate the proof of the gravity of the nuisance, which is proven by the declarations, photographs, and videos. Each episode of air pollution exposure constitutes further irreparable injury.

To prevent, or at least lessen, further injury to the Plaintiffs, their families, and their neighbors, the Plaintiffs seek a tailored preliminary injunction with two primary components. First, the Plaintiffs ask the Court to appoint an expert, with the requisite public health and technical air pollution knowledge and experience, to:

a. Oversee, in consultation with Plaintiffs, the installation and operation of an array of reasonably priced, multiple-chemical air pollution monitors to be located at strategic locations along or near the Coke Plant's fence-line boundary and in the neighboring community, especially along Back Road, to perform continuous, real time monitoring of additional air pollutant emissions from the Coke Plant, including of particulate matter and volatile organic compounds (VOCs);

b.  Implement and oversee a community reporting program for the Coke Plant's neighbors, especially along Back Road, to report nuisance conditions and events to the expert via text, email, or phone call;

c.  Investigate any nuisance reports to attempt to ascertain the root cause of reported nuisance events (to conduct such investigations, the expert must be authorized to inquire with Coke Plant personnel about root causes of any such events, to review plant operations information, and to review air monitoring data gathered by the monitors);

d.  To assess, on a weekly basis, the Coke Plant's records and data for compliance with applicable air pollution regulations, including those relating to proper coke oven pushing and quenching practices; and,

e.  Provide the Court, and all parties, with at least monthly reports on the community reporting program, including the results of root cause investigations into nuisance events.

Second, upon the expert verifying any nuisance report—*i.e.*, determining that the Coke Plant has released air pollution in such quantities or concentrations as to endanger health, welfare, or safety and/or causing unreasonable injury or damage to property—and, if possible, identifying the underlying root cause(s) of any such nuisance event, the Court should require Defendants to take immediate steps, including requiring immediate operational changes, to abate the nuisance-creating causes.

The Defendants should pay the costs associated with the ordered injunctive relief.

Plaintiffs demonstrate that they meet each of the injunctive relief elements in the accompanying memorandum of law, which along with the attached exhibits, form the basis of this Motion and the relief requested above. In particular, the facts demonstrate: (1) Plaintiffs are likely to succeed on the merits of their nuisance claims; (2) Plaintiffs are likely to continue to suffer irreparable harm in the form of exposure to toxic air pollution from the Coke Plant; (3) the balance of equities warrants issuance of the injunction; and (4) an injunction is in the public interest, as the requested relief will minimize ongoing threats from exposure to toxic air pollution that violates federal air laws. *Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008).

Plaintiffs also respectfully request that this Court waive any bond requirement. Courts in this circuit have long held that "the district court possesses discretion over *whether* to require posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis in original) (quoting *Moltan v. Eagle Picher Indus. Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). Imposing a bond requirement in this case would be especially inequitable given Defendants' nearly continuous violations of the Ohio Air Nuisance Rule, OAC § 3745-15-07, and Plaintiffs' strong likelihood of success on the merits. Waiving the bond requirement is also appropriate since the Plaintiffs seek to vindicate public interests by enforcing federal

laws. *Eagle Picher Indus. Inc.*, 55 F.3d at 1176 (affirming decision refusing to require posting of security because of the strength of the plaintiff's case and the "strong public interest involved").

Accordingly, the Plaintiffs respectfully request that the Court grant the requested injunction.

Respectfully submitted,

s/ D. David Altman

D. David Altman (0021457), *Trial Attorney*
Justin D. Newman (0080968)
Robin A. Burgess (0096442)
*AltmanNewman Co. LPA*
15 East 8th Street, Suite 200W
Cincinnati, Ohio 45202
(513) 721-2180
Fax: (513) 721-2299
daltman@environlaw.com
*Attorneys for the Sampsons and Gannons*

<u>**TABLE OF CONTENTS AND SUMMARY OF ARGUMENT**</u>

I.        <u>**INTRODUCTION**</u> (p. 1)

The Plaintiffs' declarations describe irreparable harm, including being engulfed by waves of pollution, degradation of property, interference with the use of their properties, and physical symptoms they experience after the exposure to toxic clouds of pollution, that warrants preliminary injunctive relief. This same evidence also establishes that Plaintiffs are likely to prove hundreds of violations of the Ohio Air Nuisance Rule, a provision designed to serve as a safety net from localized air pollution.

II.       <u>**THE COKE PLANT IS CREATING A PUBLIC AIR NUISANCE THAT THREATENS FURTHER IRREPARABLE INJURY TO THE PLAINTIFFS**</u> (p. 2)

Jim Sampson, Bobbi Sampson, Brian Gannon, and Mary Gannon all live within the Coke Plant's immediate zone of pollution. For at least the past 5 years, the Plaintiffs and their families have frequently, and without warning, been exposed to a wide array of air pollutants known to be deleterious to health, including PM2.5. The pathways of exposure from the Coke Plant to the Plaintiffs are active and complete. The Plaintiffs have visually witnessed hazes and clouds form over the Coke Plant and travel to their properties. Intense and foul odors often accompany these clouds. The Plaintiffs have experienced physical symptoms after exposure, including coughing, gagging, nausea, chest pains, and vertigo. The Plaintiffs have had their security in their homes taken from them by the Coke Plant, as they often worry when the next pollution cloud may

strike. Because they live under a constant threat of invasion, the Plaintiffs no longer use the outdoors like they once did.

Under air expert William Auberle's monitoring protocol, the Plaintiffs have gathered data, which Mr. Auberle has analyzed, concluding that PM2.5 concentrations are significantly higher when the Sampsons' and Gannons' properties are being impacted by Coke Plant emissions. Renowned public health physician Dr. Carpenter has opined, based on the scientific and medical literature, the Plaintiffs' sworn statements, and visual evidence of pollution, that the large quantities of pollutants emitted by the Coke Plant endanger the health and welfare of the Sampsons and Gannons.

### III.    <u>LAW AND ARGUMENT</u> (p. 9)

The four injunctive relief factors support issuance of the injunction, as the Plaintiffs have a strong likelihood of prevailing on their air nuisance claims; Plaintiffs will continue to suffer irreparable harm including ongoing exposure to toxic air pollution; any burden associated with compliance with the injunction is substantially outweighed by the need to prevent further irreparable harm; and the injunction would serve the public interest of furthering compliance with the federal Clean Air Act. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).

> **A.    Plaintiffs are likely to prevail on their nuisance claims.** (p. 10)
>
> **1.    Plaintiffs are likely to prove the Coke Plant is an air nuisance in violation of the Ohio SIP.** (p. 10)

The Ohio Air Nuisance Rule, O.A.C. § 3745-15-07, is federally enforceable by Plaintiffs through the CAA. *See Fisher v. Perma-Fix of Dayton, Inc.*, S.D.Ohio No. 3:04-cv-418, 2006 U.S. Dist. LEXIS 5389, at *14 (Jan. 27, 2006); *City of Ashtabula v. Norfolk S. Corp.*, 633 F. Supp. 2d 519, 528-29 (N.D. Ohio 2009). The provision makes unlawful the emission of air pollution in such amounts as to endanger the health, safety, or welfare of the public, or in such amounts to cause unreasonable injury to property. O.A.C. § 3745-15-07. This Court has recognized that air pollution's interference with the use and enjoyment of property and reduction of property values were the types of harms the Ohio Air Nuisance provision protects against. *Beck v. Stony Hollow Landfill, Inc.* 2017 U.S. Dist. LEXIS 65874, at *8 (May 1, 2017). The Plaintiffs' sworn declarations, visual evidence of pollution, PM2.5 data, and the expert analyses demonstrate that the Coke Plant has endangered the health and welfare of the public with its toxic emissions and interfered with the use of property to an unreasonable extent.

**2. Plaintiffs are likely to succeed on the merits of their common-law nuisance claims.** (p. 16)

The Ohio Air Nuisance Rule is a "legislative declaration" that conduct in violation of that provision is an unreasonable interference with a public right. *Ibid*. The facts set forth in the attached exhibits demonstrate repeated violations of the Ohio Air Nuisance Rule; the first element of unreasonable interference with a public right is satisfied. Additionally, the Plaintiffs (who are private landowners) have suffered injuries distinct in kind from those suffered by the general public, including the

inability to use and enjoy their properties as they would like, stress about their health and well-being, and serious adverse physical symptoms such as vertigo, headaches, and chest pains following exposure. *Beck v. Stony Hollow Landfill, Inc.*, 2017 U.S. Dist. LEXIS 65874, 5 (S.D. Ohio May 1, 2017).

The Plaintiffs are also likely to prevail under qualified private nuisance. *Little Hocking Water Assn. v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 972 (S.D. Ohio 2015). A qualified private nuisance is essentially a claim for negligence requiring duty, breach, damages/injury resulting from the breach, and proximate causation between the breach and injury. *Id.* at 972-73. The injury "must be real, material, and substantial." *Banford v. Aldrich Chem, Co., Inc.*, 126 Ohio St. 3d 210, 213, 2010 Ohio 2470, 932 N.E.2d 313, 317 (Ohio 2010). Defendants' breach of duty and proximate causation are established by the photographs, videos, declarations, and air monitoring data, all of which demonstrate the invasion of the Plaintiffs' interest in the private use and enjoyment of their land.

### B. Plaintiffs will continue to suffer irreparable harm. (p. 19)

Courts have recognized that the "significant health and environmental effects" associated with toxic air pollution are "irreparable." *Sierra Club v. United States Dep't of Agric.*, 841 F.Supp. 2d 349, 358-59 (D. D.C. 2012); *United States v. Westvaco Corp.*, 2015 U.S. Dist. LEXIS 176166, at *25-27 (D. Md. Feb. 26, 2015). Physical invasions and serious air pollution episodes have been ongoing for years, including hundreds of such events

in the past four years, all as described in the declarations of Mr. Sampson and Mrs. Gannon. William Auberle opines that the episodes will continue to occur without corrective action. Dr. Carpenter opines that immediate corrective steps need to be taken to reduce the exposures.

**C.   Issuance of the injunction would not cause substantial harm to others.** (p. 22)

Any potential burdens are outweighed by the ongoing irreparable harm to the Plaintiffs, especially where Defendants have violated the nuisance provision nearly continuously, monetarily benefited from those violations, and released hundreds of tons of pollutants known to be harmful to health into the neighboring community.

**D.   The public interest favors an injunction.** (p. 24)

The injunction is in the public interest because it will ensure compliance with federal air laws and protect health and welfare. *Sierra Club*, 841 F. Supp. 2d at 360; *Westvaco Corp.*, 2015 U.S. Dist. LEXIS 176166, *28.

**IV.   <u>CONCLUSION</u>** (p. 25)

Plaintiffs respectfully request that this Court enter an injunction appointing an expert to create and oversee a community reporting program, to oversee installation of air monitors, and to investigate root causes. Further, the Court should preliminarily enjoin Defendants to immediately take all steps necessary to remedy any verified nuisance event.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### I.     INTRODUCTION

The Plaintiffs' declarations tell this Court about the utter disruption of their lives by the Coke Plant over the last four years, recounting particular exemplar pollution attacks, which are ongoing. These sworn statements establish the injuries that require immediate, albeit preliminary, relief. Exemplar injuries range from Plaintiffs' specific reactions to being engulfed by the waves of pollution; to the degrading of their properties; to their curtailing outdoor use and other uses of their properties; to their fears about exposure of those who live with them and those that they no longer let visit; and, to the readings from instruments alerting them to the levels of tiny dangerous particles, not visible to the naked eye or otherwise detectable. The declarations also establish the photos, videos, and other records that back up evidence of hundreds of pollution attacks over the past four years.

This evidence constitutes overwhelming proof of an air nuisance under Ohio's State Implementation Plan and a violation of the anti-nuisance provision of the Coke Plant's air permit. The Coke Plant's duty not to create an air nuisance is separate and distinct from its duty not to violate the National Ambient Air Quality Standards—one protects the ambient air of the United States as a whole, while the anti-nuisance provisions protect those nearby from localized air pollution that threatens their health,

safety, or welfare. The evidence of nuisance produced here demands preliminary injunctive relief.

## II. THE COKE PLANT IS CREATING A PUBLIC AIR NUISANCE THAT THREATENS FURTHER IRREPARABLE INJURY TO THE PLAINTIFFS

Plaintiffs James (Jim) Sampson, Roberta (Bobbi) Sampson, Brian Gannon, and Mary Gannon all live on Back Road and within the zone of impact from the Haverhill coke plant (the Coke Plant) owned and operated by Defendants. *Gannon Decl.*, Ex. 1, ¶ 3–4; *Sampson Decl.*, Ex. 2, ¶ 3–5. Brian and Mary Gannon have lived on Back Road since 1998 and purchased their current home at 2737A Back Road, Franklin Furnace, Ohio 45629 in 2007. Ex. 1, ¶ 3. The Gannon property is approximately ¼ mile from the Coke Plant. *Id.*, ¶ 4. Jim and Bobbi Sampson have owned and lived on their property at 2737C Back Road, Franklin Furnace, Ohio 45629 since 1984. Ex. 2, ¶ 3. The Sampson property is approximately 1,500 feet from the Coke Plant. *Id.*, ¶ 5. Mr. Sampson constructed a second home for his son, Brian, and his wife, Heather, in 2002. Since that home's construction, Brian and Heather have lived there with their children. Brian's oldest son, Austin, has lived primarily with Mr. and Mrs. Sampson due to his significant health challenges.[1] *Id.*, ¶ 3.

For the past 5 years—despite entry of a Consent Decree and despite major modifications to the Coke Plant—the Sampson and Gannon families and their

---

[1] Plaintiffs have been granted leave to file a declaration regarding Austin's health challenges under seal because it contains confidential medical information.

neighbors have frequently, and often without warning, been exposed to a wide array of air pollutants, including smoke, dust, grime, acids, fumes, gases, vapors, and foul odors, released from the Coke Plant in such manner and in such amounts as to endanger the health, safety and welfare of the Sampsons and Gannons, and cause unreasonable damage to the Sampsons' and Gannons' properties. The intensity and frequency of the odors, deposits, plumes, haze, and other Coke Plant releases has gotten worse over the past two and one-half years. Ex. 1, ¶ 27; Ex. 2, ¶ 32. These releases occur as repetitive, acute incidents of varying durations and occur so frequently that they also constitute chronic exposure. *Auberle Decl.*, Ex. 3, ¶ 11. The nuisance-creating releases are ongoing and will continue.

It is undisputed that the Coke Plant emits a great many and wide variety of air pollutants, including particles; acid gases; odorous gases; hazardous air pollutants (HAPs); greenhouse gases; toxic metals; and other chemicals. Ex. 3, ¶ 12–15; *Carpenter Decl.*, Ex. 4, ¶ 10; *Fee Emission Reports for 2013–2016*, Atts. C–F to *Burgess Decl.*, Ex. 5. Hundreds of tons of air pollutants PM10 (particulate matter with a diameter of 10 micrometers or less) and PM2.5 (particulate matter with a diameter of 2.5 micrometers or less) are emitted annually. Atts. C–F to Ex. 5. All particulate matter emissions emitted from the Coke Plant and transported by winds offsite and onto neighboring properties, including the Sampsons' and Gannons' properties, are, regardless of size, a mixture of

organic and inorganic compounds, including the array of toxic metals and chemicals present in the raw coal used for producing coke. Ex. 3, ¶ 12–15; Ex. 4, ¶ 10.

The known health effects of the particulate matter, gases, metals, chemicals, and other pollutants emitted by the Coke Plant range from irritating to deadly. PM2.5 and other ultrafine particles in air pollution pose a great risk to human health and have been rated as a Group 1, known human carcinogen. Ex. 3, ¶ 13; Ex. 4, ¶ 11. PM2.5 and other ultrafine particles can penetrate to the lungs—inducing and contributing to heart disease, reduced life expectancy, and lung diseases. Ex. 4, ¶ 12, 14. In 2012, coke production was rated as an occupation known to cause cancer by the International Agency for Research on Cancer (IARC). *Id.*, ¶ 10. Particulate matter pollutants can induce sneezing, coughing, respiratory irritation and congestion, and can trigger asthma attacks. Ex. 3, ¶ 12; Ex. 4, ¶ 13, 15–16. In addition, the reactive gases released from the Coke Plant can damage paint, wood, metal, and other materials, vegetation and other organisms. Ex. 3, ¶ 12.

There is ample evidence that the pollution pathway between the Coke Plant and the Sampsons and Gannons is complete and ongoing. On hundreds of occasions over the past four years, the Sampsons and Gannons have witnessed hazes and clouds form over the Coke Plant and watched huge plumes escape from various areas of the Coke Plant, including the quench towers and stacks, and be pushed by winds towards and onto their properties. Ex. 1, ¶ 6; Ex. 2, ¶ 8. Intense and foul odors often accompany the

4

visible pollution clouds. These same odors have been detected when there is no visible pollution. Ex. 1, ¶ 7, 12; Ex. 2, ¶ 11, 20. These odor clouds last from minutes to all day and occur, unpredictably, at all hours of the day and night. Ex. 1, ¶ 7, 11–14; Ex. 2, ¶ 11, 16–22. Due to this unpredictability, Plaintiffs live in constant fear of when the next event will occur. Ex. 2, ¶ 11.

The hazes, clouds, plumes, and foul odors from the Coke Plant have made Mrs. Gannon no longer feel safe in her home or on her property and have largely forced her to reduce all the recreational activities on her property that used to make her happy. Ex. 1, ¶ 20–22, 24, 26. She is afraid that her and her families' past, present, and ongoing exposure to the Coke Plant's pollution will cause cancer or some other disease. *Id.*, ¶ 15. Exposure to the pollution and odor clouds causes Mrs. Gannon to experience annoying to unbearable symptoms including coughing; gagging; shortness of breath; irritation of the eyes, sinuses, and throat; headaches; nausea; chest pains; and vertigo. *Id.*, ¶ 7–9, 11–14. Brian Gannon suffers from burning sinuses, headaches, and chest pains after being exposed to Coke Plant pollution. *Id.*, ¶ 10. Mrs. Gannon must often wear a mask in order to stand being outside, does not have as much energy as she used to, and gets winded easily. *Id.*, ¶ 8–9. The foul odors prevent Mrs. Gannon from having her windows open when she wants to, have invaded the Gannons' home at night, and have been so invasive as to wake them up. *Id.*, ¶ 11, 22. The Coke Plant's pollution clouds leave behind black deposits that cling stubbornly to every surface and have caused Mrs.

5

Gannon to stop consuming the food she grows because she is afraid to eat anything grown in soil or air polluted by the Coke Plant. *Id.*, ¶ 16, 21. The pollution and odor clouds and black deposits have caused Mr. and Mrs. Gannon to sharply decrease the amount of time they spend outside enjoying their property. *Id.*, ¶ 20–21, 24–25. Mrs. Gannon no longer allows her children, grandchildren, and friends to visit her property because she does not want them exposed to the Coke Plant's pollution. *Id.*, ¶ 15, 26.

The foul hazes, clouds, plumes, and odors from the Coke Plant have taken the Sampsons' security in their home away, and the constant and persistent presence of the black deposits have taken away the Sampsons' ability to make their home presentable and enjoyable. Ex. 2, ¶ 9, 15, 23–28. The Sampsons fear for their health and for the health of their children and grandchildren who live on their property with them. *Id.*, ¶ 9, 23. Out of fear of further exposure to the Coke Plant's pollution, Mrs. Sampson does not go outside as often as she used to. *Id.*, ¶ 13. Exposure to the pollution and odor clouds causes Mr. Sampson to experience irritating to unbearable symptoms including coughing; gagging; vomiting; irritation of the eyes, sinuses, and throat; shortness of breath; headaches; and nausea. *Id.*, ¶ 12, 14. Mrs. Sampson coughs and hacks, suffers from sinus issues, and gets headaches after getting caught in the odorous pollution clouds. *Id.*, ¶ 13. Mr. Sampson can feel particles from the odorous pollution clouds in his mouth and throat, which have an unpleasant metallic taste. *Id.*, ¶ 12.

The Sampsons' six grandchildren, ages 19, 16, 13, 8, 6, and 21 months, who live on their property all have sinus/allergy issues and respiratory problems and two have asthma. Ex. 2, ¶ 15. Starting approximately 18 months ago, the Sampsons, including their children and grandchildren, have all experienced severe fatigue after exposure to the Coke Plant's pollution. *Id.*, ¶ 23. The black deposits, odorous pollution clouds, and concerns about their health have caused the Sampsons to stop consuming the produce their grandson grows on their property and to sharply decrease the time they spend sitting on their deck or the screened-in porch and using the grill and fire pit area. *Id.*, ¶ 29–31.

While the factual, direct observations and experiences of the Sampsons and Gannons are more than sufficient to show that the Coke Plant is creating a public nuisance and causing ongoing irreparable harm, renowned air pollution control and regulation expert William Auberle and public health expert Dr. David O. Carpenter both opine that the Coke Plant has and will continue to create an air nuisance and that immediate steps are needed to reduce the Sampsons', the Gannons', and their families' and neighbors' exposures to nuisance emissions. Ex. 3, ¶ 11, 28; Ex. 4, ¶ 20, 29.

Mr. Auberle has spent his 50-year career as an environmental engineer, air pollution regulator, and air pollution control consultant and has extensive experience investigating, mitigating, and overseeing abatement of nuisance-causing air pollution. Ex. 3, ¶ 4–8. In addition, he has wide experience designing, installing, and operating air

pollutant monitoring networks. *Id.*, ¶ 9. Mr. Auberle opines that air pollutants released from the Coke Plant create a public nuisance and are a threat to humans and property near the Coke Plant, including the Sampsons and Gannons, in multiple forms. *Id.*, ¶ 11–24. To assess the concentrations of respirable PM2.5 emitted from the Coke Plant, Mr. Auberle developed a methodology for measuring the Sampsons' and Gannons' exposures on their properties using *"AirBeam"* monitor technology furnished by Cincinnati's University Hospital. *Id.*, ¶ 16–21. Under Mr. Auberle's protocol, the Sampsons and Mrs. Gannon have collected PM2.5 at times when they visually or physically perceive pollution traveling from the Coke Plant towards their properties. *Id.*, ¶ 18. Many of the pollutants emitted by the Coke Plant can be detected by the human body—and have been detected by the Sampsons and Gannons on numerous occasions. Because the human body cannot detect or feel PM2.5, the *AirBeam* monitors have provided objective PM2.5 data that corroborates the Sampsons' and Gannons' accounts of the impacts of the Coke Plant's pollution. *Id.*, ¶ 23. Mr. Auberle's analysis of the data reveals that PM2.5 concentrations are significantly higher when the Sampsons' and Gannons' properties are being impacted by Coke Plant emissions. Ex. 3, ¶ 18, 22; Atts. A and B to Ex. 5.

Public health physician Dr. David O. Carpenter has pursued a career in biomedical research and public health where he evaluates the causes of health effects in humans that result from exposure to environmental contaminants. Ex. 4, ¶ 4–9. Based

on the Sampsons' and Gannons' sworn statements, the PM2.5 data, Mr. Auberle's analysis, scientific studies and other literature, and his extensive expertise as a public health expert, Dr. Carpenter opines that the large quantities of pollutants emitted by the Coke Plant endanger the health and welfare of the Sampsons and Gannons and their neighbors. *Id.*, ¶ 10–29.

### III.   LAW AND ARGUMENT

The focus of a preliminary injunction is to prevent further irreparable injury and may require the preliminary relief to go beyond preservation of the status quo, especially where the status quo would lead to further irreparable harm. *United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998). This Court is required to balance four factors to determine whether to grant a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).[2] However, "[t]hese four considerations are 'factors to be balanced, not prerequisites that must be met.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). A strong showing on likelihood of success and the likelihood of irreparable harm may

---

[2] In *Winter*, the Supreme Court refers to the third factor as a balancing of the equities. The Sixth Circuit frequently refers to the factor as the "substantial harm to others" analysis, but it is clear that the equities are balanced regardless of terminology. *Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008)

lessen the showing need on the third and fourth factors. As discussed below, each of these considerations overwhelmingly favors issuance of the preliminary injunction.

### A. Plaintiffs are likely to prevail on their nuisance claims.

The facts regarding the severity of the adverse effects of the pollution from the Coke Plant on the Plaintiffs and their properties demonstrate they are substantially likely to prevail on both their Ohio Air Nuisance Rule and common law nuisance claims. *Complaint*, First and Twenty-Eighth Claims, Doc. 1, PageID 29 and 59.

### 1. Plaintiffs are likely to prove the Coke Plant is an air nuisance in violation of the Ohio SIP.

As part of their Clean Air Act (CAA) citizen suit, the Plaintiffs are authorized to seek an injunction securing Defendants' compliance with any requirement of any federally-approved State Implementation Plan ("SIP"), and any term and condition of a permit issued under the CAA. 42 U.S.C. § 7604(a)(1) and (f). Ohio's public nuisance prohibition, O.A.C. § 3745-15-07, was approved by U.S. EPA as part of Ohio's SIP on October 12, 1984.[3] In addition, compliance with O.A.C. § 3745-15-07 is a term of the Coke Plant's PSD Permit. Accordingly, O.A.C. § 3745-15-07 is federally enforceable by Plaintiffs through the CAA. *See Fisher v. Perma-Fix of Dayton, Inc.*, 2006 U.S. Dist. LEXIS 5389, at *14, 2006 WL 212076 (Jan. 27, 2006); *City of Ashtabula v. Norfolk S. Corp.*, 633 F. Supp. 2d 519, 528-29 (N.D. Ohio 2009).

---

[3] Plaintiffs are citing and enforcing the version of the provision that has been, and remains, a part of the Ohio State Implementation Plan.

Ohio's public nuisance prohibition reads, in pertinent part:

(A) Except as provided in paragraph (B) of this rule, the **emission** or escape into the open air from any source or sources whatsoever, **of** smoke, ashes, dust, dirt, **grime**, acids, **fumes, gases, vapors, odors**, or any other substances or combinations of substances, **in such manner** or in such amounts **as to endanger the** health, safety **or welfare** of the public, **or cause unreasonable injury or damage to property**, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

O.A.C. § 3745-15-07 (emphasis added).

While the Ohio environmental regulations do not define "welfare," the CAA defines "welfare" to include effects on property, economic values of property, *visibility*, and *personal comfort and well-being*. 42 U.S.C. § 7602(h) (emphasis added). Terms such as "endanger," "damage," and "unreasonable,"—also not defined in Ohio's environmental regulations—should be given their common or plain meaning. Endanger means "[t]o expose to harm or danger" or "imperil" while "unreasonable" means "[e]xceeding reasonable limits…" *American Heritage Dictionary of English Language*, 3rd Edition. "Safety" refers to "…freedom from danger, risk, or injury," while "health" is the "…condition of an organism at a given time." *Ibid*. And, "damage" means "[i]mpairment of the usefulness or value of… property" or "harm." *Ibid*.

Hence, violations of the nuisance provision are shown when a facility releases air pollution in such amounts as to: (1) expose the happiness or well-being of the public (welfare) to harm or danger or to imperil happiness or well-being; or (2) impair the usefulness of or cause harm to property beyond reasonable limits; or (3) expose others

11

to harm, risk, danger, or injury. This Court has recognized that air pollution's interference with the use and enjoyment of property and reduction of property values were the types of harms the Ohio Air Nuisance provision protects against. *Beck v. Stony Hollow Landfill, Inc.*, 2017 U.S. Dist. LEXIS 65874, at *8, 2017 WL 1551216 (S.D. Ohio May 1, 2017).

In the case at bar, the Coke Plant has plagued the community, especially in the Back Road area—as shown by factual sworn testimony, photographs, and video and as confirmed by PM2.5 data—with foul emissions of black greasy and oily deposits, dust, clouds, plumes, and hazes of pollution. Ex. 1; Ex. 2; Ex. 3, ¶ 16–24. The Gannons and Sampsons have experienced hundreds of severe episodic events over the past four years, including especially severe releases during the past year. Ex. 1, ¶ 6–14; Ex. 2, ¶ 8–23.

During and after such severe episodic releases, the Plaintiffs experience adverse physical symptoms. Both Mrs. Gannon's and Mr. Sampson's sworn declarations describe experiencing severe headaches, stinging/burning of the eyes, upset stomach/nausea, coughing and sneezing, fatigue, and chest pains. Ex. 1, ¶ 8–13; Ex. 2, ¶ 12–21, 23. Mr. Sampson has vomited after exposure to particularly severe pollution clouds, while Mrs. Gannon has experienced, over the past year, vertigo-like symptoms

after exposure.[4] Ex. 2, ¶ 12, Ex. 1, ¶ 9. Each of Mr. Sampson's six grandchildren who live on Mr. Sampson's Back Road property suffers from sinus and respiratory difficulties. Ex. 2, ¶ 15. The types of air pollutants that the Coke Plant releases are linked to these types of physical effects. Ex. 3, ¶ 12, 27; Ex. 4, ¶ 23.

The Plaintiffs frequently observe the clouds travelling off-site, from areas such as the quenching operations, into the neighboring community, or can identify the Coke Plant as the source of the pollution clouds because of what they recognize to be a distinctive Coke Plant or "green oven" odor. Ex. 1, ¶ 6–7, 11–13, Ex. 2, ¶ 8, 10–11, 16–21. The physical effects experienced during and after they are exposed to green oven odors are especially severe. Ex. 1, ¶ 13, Ex. 2, ¶ 21. The Plaintiffs also "fingerprint" the Coke Plant as the source of the clouds because of characteristic "tastes" that they know to be from the Coke Plant (*e.g.*, "metallic" or coke "particle" tastes) and the physical symptoms associated with such exposures. Ex. 1, ¶ 8; Ex. 2, ¶ 12. For example, Mr. Sampson describes exemplar episodes from late May 2018:

> Around 9:10 AM on May 26, 2018, I could smell the Coke Plant when I went outside. The odor was accompanied by a bitter, metallic taste. The

---

[4] Mrs. Gannon's declaration describes several severe episodic releases from the past several months, including a particularly severe episode on April 3, 2018:

> On April 3, 2018, the Coke Plant had been stinking all day; when I went outside at 1:30 PM, I became nauseated. The smell caused me to sneeze and irritated my sinuses and throat. It was still stinking badly at 3:30 PM. I went out just after 4 PM and there was a strong gust of wind; it was stinking really badly. I felt sick to my stomach and my head felt odd like a headache was going to start; the pollution from the Coke Plant was getting in my eyes and mouth. I woke up the next morning with a headache.

Ex. 1, ¶ 11.i.

Coke Plant smells were very bad around 10 AM, when Austin and I went over to the Gannons' property. Austin and I left to run errands and returned to the Gannons' around 1:15 PM; the Coke Plant odors were still really bad. Shortly after we returned home, around 1:49 PM, I could still smell terrible odors from the Coke Plant. The odors left a metallic taste in my mouth and gave me a headache, both of which lasted all afternoon. I could still smell the Coke Plant at 11 PM when I went outside. Early on May 28, around 1:00 AM, the Coke Plant was very smoggy and smoky and the stink from the Coke Plant was bad. The fumes made me cough a lot, irritated my throat and nasal passages, and left a metallic bitter taste in my mouth. I went out again around 9:10 AM. The Coke Plant was foggy and I could smell the fumes, which again irritated my throat and nasal passages and gave me a headache.

Ex. 2, ¶ 19.h.

Entrained in the toxic and hazardous air pollution from the Plant is PM2.5, for which health and environmental organizations and public health and medical literature conclude there is no safe level of exposure. Ex. 4, ¶ 18. Such particles are so small that they become lodged deep into the lungs and result in severe health effects, especially in older adults and young children, such as Mr. Sampson's grandchildren. *Id.*, ¶ 11, 18, 24. The Defendants' own records confirm that they knowingly emit *approximately one hundred tons* of this particularly harmful pollutant on an annual basis. Atts. C–F to Ex. 5.

Dr. Carpenter concludes that the Coke Plant's air pollution endangers the health and welfare of the Sampsons and Gannons and other community residents. Ex. 4, ¶ 20–29. The PM2.5 data gathered by the Plaintiffs is significant because PM2.5 pollution, alone, is sufficient to endanger the health and safety of the public, including the

14

Plaintiffs. *Id.*, ¶ 11–12, 18, 21, 28. Here, however, the exposures, which are so frequent as to be both chronic and acute, are multi-pollutant, including metals and a whole host of other substances known to be deleterious to health. Ex. 3, ¶ 11–15; Ex. 4, ¶ 10–18, 20–29. The PM2.5 data also corroborate the pollution-related observations of the Plaintiffs and further confirm the presence of completed air pollution migration pathways, as air pollution expert William Auberle concludes, from the Coke Plant's operations to the breathing zones of those on Back Road. Ex. 3, ¶ 23.

Simply stated, the evidence overwhelmingly demonstrates that the Plaintiffs are likely to prevail on their Ohio Air Nuisance Rule claims because the particulates, vapors, fumes, dusts, and other substances released from the Coke Plant are endangering the health and safety of the public, including the Plaintiffs.

The evidence also demonstrates that the Coke Plant is impairing the usefulness of or causing harm to property beyond reasonable limits. The greasy and oily deposits accumulate nearly every day and coat window ledges, decks, lawn furniture, and grass, and concrete. Ex. 1, ¶ 16–19, 23; Ex. 2, ¶ 24–27. The Gannons' property is also coated with materials from the Coke Plant to such an extent that Mrs. Gannon cannot keep her property clean and has curtailed many of the outdoor activities, such as gardening, that once made her happy. Ex. 1, ¶ 17, 20, 22–25. Mrs. Gannon and Mrs. Sampson are basically forced to shut themselves inside their homes frequently to avoid exposure. Ex. 1, ¶ 20–22, 24; Ex. 2, ¶ 13. Both families experience severe worry and apprehension

15

about when the next pollution cloud will strike. Ex. 1, ¶ 7, 15, 26; Ex. 2, ¶ 9, 11, 13, 23. Mrs. Gannon has taken steps to avoid exposure of her grandchildren and friends by either not inviting them over or limiting the amount of time she allows them on her property. Ex. 1, ¶ 15, 26. The Plaintiffs' security in their homes and properties has been taken away by the Coke Plant. Ex. 1, ¶ 26; Ex. 2, ¶ 9. These same facts also show Plaintiffs are highly likely to prove at trial that the Coke Plant is exposing the public's "happiness, well-being or prosperity" (welfare) to harm or danger.

**2. Plaintiffs are likely to succeed on the merits of their common-law nuisance claims.**

<u>First</u>, in light of the facts set forth above on their Ohio Air Nuisance claim, the Plaintiffs are likely to succeed on a claim for common-law public nuisance. "A public nuisance is 'an unreasonable interference with a right common to the general public.'" *Beck*, 2017 U.S. Dist. LEXIS 65874, at *5 (quoting *Kramer v. Angel's Path, LLC*, 2007-Ohio-7099, ¶¶ 15-23 (Ct. App.)). To prevail, the Plaintiffs must show both unreasonable "interference with a public right" and an injury "different in kind" than that suffered by the other members of the public. *Id*. at *5-6 (quoting *Kramer,* 2007-Ohio-7099, ¶¶ 15-16). The Ohio Air Nuisance Rule is a "legislative declaration" that conduct in violation of that provision is an unreasonable interference with a public right. *Id*. at *8-9 (quoting *Hager v. Waste Techs. Indus.*, 2002-Ohio-3466, ¶ 81 (Ct. App.)). In light of the facts discussed above in Section III.A.1., demonstrating repeated violations of the Ohio Air

Nuisance Rule, the first element of unreasonable interference with a public right is satisfied.

Additionally, the Plaintiffs (who are private landowners) have suffered injuries distinct in kind from those suffered by the general public, including the inability to use and enjoy their properties as they would like, stress about their health and well-being, and serious adverse physical symptoms such as vertigo, headaches, and chest pains following exposure. As this District has recognized, "property owners are uniquely situated to pursue a nuisance claim: 'When the particular harm involved consists of interference with the use and enjoyment of land, the landowner may recover either on the basis of the particular harm to her resulting from the public nuisance or on the basis of private nuisance.'" *Beck*, 2017 U.S. Dist. LEXIS 65874, at *9 (quoting *Brown v. Cnty. Comm'rs*, 622 N.E.2d 1153, 1160 (Ct. App. 1993)). Hence, the Plaintiffs are likely to prevail on their common-law public nuisance claim.

Second, Plaintiffs are likely to prevail on qualified private nuisance. A private nuisance is defined as a "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Little Hocking Water Assn. v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 972 (S.D. Ohio 2015) (quoting *Hager*, 2002-Ohio-3466, ¶¶ 127-132). A qualified private nuisance is essentially a claim for negligence requiring duty, breach, damages/injury resulting from the breach, and proximate causation between the breach and injury. *Id.* at 973. The injury "must be real, material, and substantial." *Banford v.*

17

*Aldrich Chem, Co., Inc.*, 126 Ohio St. 3d 210, 213 (Ohio 2010). Conditions affecting one's sight, smell, hearing, or that cause physical discomfort satisfy the material injury requirement. *Beck*, 2017 U.S. Dist. LEXIS 65874, * 11-12 (citing *Banford*, 126 Ohio St. 3d at 318).

Each of these elements is met. Defendants have a duty to prevent their air pollution from endangering the health, welfare, and property of neighboring property owners. *Beck*, 2017 U.S. Dist. LEXIS 65874 at *9-10. The Plaintiffs' sworn testimony establishes that Defendants have breached their duties and proximately caused injury by unleashing clouds of pollution that have frequently engulfed Plaintiffs, interfering with their use and enjoyment of their properties, including by forcing the Plaintiffs to curtail outdoor activities that they once enjoyed. The breach of duty and proximate causation are also established by the photographs, videos, and air monitoring data, all of which demonstrate the invasion of the Plaintiffs' interest in the private use and enjoyment of their land. And, the physical injuries are not "trifling," as the Plaintiffs have come forward with sworn facts about suffering from vertigo, headaches, chest pains, being exposed to offensive odors and clouds, and even being woken up in the middle of the night as a result of air pollution from the Coke Plant. Ex. 1, ¶¶ 8–14; Ex. 2, ¶ 12–23. The physical discomfort, which is at times unbearable, and other adverse effects from pollution suffered by Plaintiffs are material injuries under the case law. The injuries are also foreseeable. Defendants have been aware, for years, about adverse

impacts on the use and enjoyment of property and have known that the Coke Plant releases hundreds of tons per year of harmful substances into the surrounding community. Atts. C–F to Ex. 5. These facts amply demonstrate that the Plaintiffs are substantially likely to prevail on their qualified private nuisance claim.

**B.    Plaintiffs will continue to suffer irreparable harm.**

The evidence must also demonstrate that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22. An injury is irreparable if it cannot be *fully* compensated by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) ("…an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Here, at issue in this Motion is the ongoing irreparable harm and threatened additional irreparable harm resulting from Defendants' ongoing air pollution. As outlined above, the Plaintiffs have collected data that shows elevated concentrations of PM2.5 that have reached their properties and been detected via the *AirBeam* monitors. Ex. 3, ¶ 16–22. This further demonstrates a completed pathway from the Coke Plant to the Plaintiffs' breathing zone. Dr. Carpenter has opined that the significant waves of pollution, which include PM2.5, threaten human health and have likely contributed to a

19

number of the health effects experienced by the Plaintiffs. Ex. 4, ¶ 20–29. Indeed, as Dr. Carpenter opines, PM2.5 particles lodge deep into the lungs and can work their way into the blood stream, and PM2.5 is associated with a number of serious adverse health effects, including heart and lung diseases and other adverse respiratory effects and symptoms. *Id.*, ¶ 11–14, 18. Dr. Carpenter opines that PM2.5 is a zero-threshold pollutant, meaning that there is no safe level of exposure. *Id.*, ¶ 18.

In fact, courts have recognized that the "significant health and environmental effects" associated with PM2.5 are "irreparable." *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 963-64 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010); *Sierra Club v. United States Dep't of Agric.*, 841 F. Supp. 2d 349, 358-59 (D. D.C. 2012) (holding that threat of increased air pollution, including PM2.5 air pollution, constitutes irreparable harm because of the well-documented health effects associated with PM2.5 exposure); *United States v. Westvaco Corp.*, 2015 U.S. Dist. LEXIS 176166, at *25-27, 2015 WL 10323214 (D. Md. Feb. 26, 2015) (finding irreparable harm because PM2.5 threatens health and the environment, even at levels below national air standards).

Importantly, this case does not involve exposure to ***just*** PM2.5 air pollution. There is a toxic swarm of pollutants that are being emitted from the Coke Plant, including PM10, sulfur dioxide compounds, nitrogen oxides, volatile organic compounds, and heavy metals. Ex. 3, ¶ 11–15, 23; Ex. 4, ¶ 10, 20. These other materials are also deleterious to health. And, the Plaintiffs have on hundreds of occasions during

the past four years, ***including severe episodes in the past few weeks***, suffered serious health effects after exposure to clouds and plumes of pollution from the Coke Plant, including headaches, respiratory irritation, shortness of breath, nausea, vertigo, and chest pains. Ex. 1, ¶ 8–14; Ex. 2, ¶ 12–23. Dr. Carpenter opines that exposure to the substances released from the Coke Plant is known to lead to the types of health effects experienced by the Plaintiffs. Ex. 4, ¶ 20, 23–24. The Plaintiffs also live in constant fear, which induces stress, about when the next pollution cloud will envelope their properties and result in exposure for themselves, their children, or their young grandchildren and fear for their health and their families' health. Ex. 1, ¶ 7, 15, 20–21, 23–26; Ex. 2, ¶ 9, 11, 15, 23, 30–31. *See Save Our Summers v. Wash. Dep't of Ecology*, 132 F. Supp. 2d 896, 905 (E.D. Wa. 1999) (finding irreparable harm where plaintiffs suffered from respiratory ailments as a result of challenged action).

Further, the Plaintiffs are suffering irreparable injury to their properties and their use and enjoyment of their properties that cannot be fully remedied through money damages. Money damages will not prevent future invasions and interference. Such invasions and interference have been recognized by Ohio courts to be irreparable injury for which injunctive relief lies. *Adams v. Snouffer*, 87 N.E.2d 484, 486 (Ct. App. 1949).

These physical invasions and pollution episodes have been ongoing for years, including hundreds of such events in the past four years, all as described in the declarations of Mr. Sampson and Mrs. Gannon. Ex. 1, ¶ 6–14; Ex. 2, ¶ 8–23. Renowned

air pollution expert William Auberle opines that the episodes will continue to occur without corrective action, including the community reporting program and root cause investigation steps he outlines in his declaration. Ex. 3, ¶ 24–28. Dr. Carpenter opines based on the declarations, data, and medical literature that immediate corrective steps need to be taken to reduce the exposures of those living on Back Road, including the Plaintiffs. Ex. 4, ¶ 19–29. Hence, it is clear the Plaintiffs have suffered and will continue to suffer irreparable harm without the requested injunction.

**C.   Issuance of the injunction would not cause substantial harm to others.**

The third factor balances the relative harms v. benefits that would result from issuance of the injunction. Because environmental injuries are generally irreparable, if the environmental injury is sufficiently likely, the "balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545. In fashioning an equitable remedy under an environmental statute, district courts should focus on "the underlying substantive policy the [statute] was designed to effect." *Id*. at 544. "By enacting the Clean Air Act, Congress established a high priority for the control of air pollution. The legislature recognized that compliance would be expensive in some cases, but the choice was made to require compliance with [CAA] standards…" *United States v. Painesville*, 644 F.2d 1186, 1194 (6th Cir. 1981).

And, "[h]arm to [the] environment outweighs a defendant's financial interests, particularly where violations are of a longstanding and continual nature." *Idaho*

22

*Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161 (D. Idaho 2012). Further, any "burden" associated with complying with existing legal obligations is not the type of hardship that tips the analysis in a defendant's favor. *Luxottica Retail N. Am. Inc. v. CAS-MAN, Inc.*, 2011 U.S. Dist. LEXIS 15603, at * 22, 2011 WL 672063 (S.D. Ohio Jan. 14, 2011) (finding defendants face no hardship by being forced to refrain from violating trademark law and being forced to comply with contractual obligations); *Baker Hughes Oilfield Operations, Inc. v. Beard*, 2016 U.S. Dist. LEXIS 15068, at * 5-6 (D. Colo. Feb. 8, 2016) (finding compliance with statutory and contractual obligations does not place a burden on a party that is relevant to the injunction analysis ).

In this case, the Coke Plant is already required to comply with the Ohio Air Nuisance Rule, and Plaintiffs simply seek minimum steps to reduce the deleterious impact of nuisance-causing operations pending the trial on the merits. The concerns of any potential burdens associated with complying with the requested injunction should not, therefore, be balanced against the ongoing irreparable harm to the Plaintiffs, especially where the evidence shows Defendants have violated the nuisance provision nearly continuously over the past four years. Defendants continue to monetarily benefit from these violations and knowingly release hundreds of tons of pollutants known to be harmful to health into the neighboring community, all the while misleading the public by characterizing quench plumes loaded with particulates as "water vapor." Att.

G to Ex. 5. What is more, any burden is plainly outweighed by the need to lessen the exposures of the Plaintiffs, their families, and their neighbors.

**D.    The public interest favors an injunction.**

The requested injunctive relief will serve the public interest by lessening the adverse impact of Defendants' persistent violations of the Ohio Air Nuisance Provision and will protect public health and welfare in the Franklin Furnace and Back Road community surrounding Defendants' property. *United States v. Apex Oil Co.*, 2008 U.S. Dist. LEXIS 59973, at *218 (S.D. Ill. July 28, 2008) (granting injunction under another environmental statute, the Resource Conservation and Recovery Act, because "it is clear that entry of the requested injunction would benefit [the public] and promote the Congressionally-expressed public interest in 'minimizing the present and future threat to human health and the environment' posed by solid and hazardous wastes."); *United States v. Westvaco Corp.*, 2015 U.S. Dist. LEXIS 176166, at * 28, 2015 WL 10323214 (D. Md. Feb. 26, 2015) (public interest served by "reducing the risk of harm to human health and the environment").

Further, it is in the public interest to ensure federal laws are enforced. *Bd. of Edn. v. U.S. Dept. of Edn.*, 208 F. Supp. 3d 850, 878 (S.D. Ohio 2016) (holding it was in the public interest to enforce constitutional rights and Title IX); *Sierra Club*, 841 F.Supp. 2d at 360 (public has an interest in ensuring that federal agency actions comply with federal environmental laws); *Westvaco Corp.*, 2015 U.S. Dist. LEXIS 176166, *28. Here, the

24

requested injunction will ensure investigation of the root causes of nuisance events and prompt correction of those root causes, advancing enforcement of the federally enforceable Ohio Air Nuisance Rule.

## IV.   <u>CONCLUSION</u>

The public health and environmental issues at stake in this case warrant a remedy that is protective of public health and that furthers compliance with federal clean air laws, including the federally enforceable Ohio Air Nuisance Rule. Accordingly, the Plaintiffs respectfully request that this Court enter an injunction appointing an expert to create and oversee a community reporting program, as outlined in the Motion, and to investigate root causes. Further, the Court should preliminarily enjoin Defendants to immediately take all steps necessary to remedy any verified nuisance event. Such an order redressing the harm to the public caused by the Coke Plant's excess nuisance-causing emissions is well within the recognized equitable powers of this Court.

Respectfully submitted,

<u>s/ D. David Altman</u>

D. David Altman (0021457), *Trial Attorney*
Justin D. Newman (0080968)
Robin A. Burgess (0096442)
*AltmanNewman Co. LPA*
15 East 8th Street, Suite 200W
Cincinnati, Ohio 45202
(513) 721-2180
Fax: (513) 721-2299

daltman@environlaw.com
*Attorneys for the Sampsons and Gannons*

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2018, I electronically filed a copy of the foregoing motion with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties in the case by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robin A. Burgess

Robin A. Burgess
*An Attorney for Plaintiffs*